Levie S. JACKSON, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 79A02–0912–CR–1230.

Court of Appeals of Indiana.

Nov. 22, 2010.

Daniel J. Moore, Laszynski & Moore, Lafayette, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Ann L. Goodwin, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BROWN, Judge.

Levie Jackson appeals his convictions for seven counts of forgery as class C felonies,[1] six counts of theft as class D felonies,[2] and his adjudication as an habitual offender.[3] Jackson raises two issues, which we revise and restate as:

I. Whether the trial court erred when it denied his motion to sever the charges; and

II. Whether the trial court erred in allowing the State to file a belated habitual offender information.

We affirm.

The facts most favorable to the convictions follow. On October 18, 2006, Jackson, dressed in dark pants, a white shirt, and a tie, approached seventy-eight-year-old Dale Cummings at a Menards in Tippecanoe County and asked if he was finding everything he needed. Because of his attire, Cummings "assumed that he was an employee." Transcript at 62. Jackson followed Cummings to his car, and as Cummings was leaving Jackson tapped on his window and told him that he could sign him up for a fifteen percent discount at the store. Cummings told Jackson he was interested, and Jackson stated that he would be right back with the relevant paperwork. Jackson returned with paper and a clipboard and sat down in the passenger seat of Cummings's car. Jackson asked for proof that Cummings was over sixty-five-years-old, and Cummings handed Jackson his wallet. Jackson wrote some information down, gave Cummings his wallet back, and left. Later that day, Cummings was notified of some suspicious activity on one of his credit cards, and after checking his wallet he realized that he was missing two credit cards and a debit card.

Around 2:00 p.m. that same day, Jackson purchased three cartons of Newport cigarettes and two cartons of Virginia Slims cigarettes at a Speedway convenience store located on State Road 26 in Lafayette using Cummings's credit cards. Jackson signed Cummings's name on the charge slips without Cummings's permission. Jackson explained to the cashier

---

1. Ind.Code § 35–43–5–2 (Supp.2006).

2. Ind.Code § 35–43–4–2 (2004) (subsequently amended by Pub.L. No. 158–2009, § 8 (eff. July 1, 2009)).

3. Ind.Code § 35–50–2–8 (Supp.2005).

that the cigarettes "were more expensive in Chicago so he came to [her] store...." *Id.* at 72.

On February 9, 2007, eighty-one-year-old Robert Cassman was approached by Jackson in the parking lot of a Target store also located on State Road 26 in Lafayette while he was loading the trunk of his car. Cassman found Jackson to be "well dressed," and was under the impression that Jackson worked for Target. *Id.* at 96. Jackson explained to Cassman that he could get a fifteen percent discount at the store if he was a senior citizen. Cassman was interested, and Jackson went into the store. Because it was cold outside, Cassman started back to the store to find Jackson to see if they could do the transaction inside, but Jackson met him in the parking lot and said that he could fill out the paperwork in Cassman's car. After entering the vehicle, Jackson asked Cassman for identification, and Cassman handed Jackson his wallet. Unbeknownst to Cassman, while Jackson had control of the wallet he removed two credit cards. Jackson then returned Cassman's wallet to him and left.

That same day, Jackson entered the Game Stop store in Lafayette and purchased two X–Box 360 game systems using Cassman's credit card. He went to the same Speedway convenience store he had visited with Cummings's credit cards and purchased four cartons of Newport cigarettes and a cup of coffee. At both the Game Stop and the Speedway, Jackson signed Cassman's name to a charge slip without Cassman's permission.

On February 12, 2007, Jackson approached eighty-four-year-old Norman Pearlman as Pearlman was leaving a Walgreens in West Lafayette and offered to arrange for Pearlman to get a ten percent senior citizen discount on merchandise. Pearlman had previously noticed Jackson in the store "walking down the aisle" and believed that Jackson was "a professional connected with Walgreens." *Id.* at 351. Pearlman let Jackson into the passenger seat of his car, and Jackson asked for proof of his age. When Pearlman gave him his social security card, Jackson said "that wasn't good enough," and that he needed Pearlman's driver's license. *Id.* Pearlman removed his driver's license and handed it to Jackson, and he put his wallet down on the seat between him and Jackson.

A few hours later, Pearlman received a phone call from his credit union "telling [him] that [his] card had been used up ... for a total of about a thousand dollars." *Id.* at 352. Pearlman then realized that he was missing three credit cards. Pearlman did not give anyone permission to take his credit cards or use them.

On June 15, 2007, at around 4:00 p.m., Jackson came upon seventy-nine-year-old Marvin Sutter and his wife napping in their car in the parking lot of a Wal–Mart on State Road 26 in Tippecanoe County. Dressed in a suit with a white shirt, Jackson tapped on Sutter's car window and stated, "not on my watch," and told Sutter that he was a security guard. *Id.* at 139. Jackson offered to retrieve an electric cart for the couple. When Jackson returned, he was holding a notepad and informed the couple that Wal–Mart was giving discounts or a rebate through the mail to customers over sixty-five years old. Jackson acted surprised when Sutter told him his age, and Jackson requested identification to confirm it. Jackson entered Sutter's car, sat in the back seat, and was given access to Sutter's wallet. Without Sutter's knowledge, Jackson removed two credit cards from Sutter's wallet and then returned the wallet. Sutter's wife shopped in the Wal–Mart for about forty-five minutes, and when she returned to the car she

told Sutter that her credit card was not working.

At 4:41 p.m. that same day, Jackson purchased a gift card for $264 using one of Sutter's credit cards at the same Speedway convenience store on State Road 26 he had visited with Cassman's and Cummings's credit cards. Two minutes later he used another of Sutter's credit cards to purchase over $163 worth of Newport cigarettes. Both times, Jackson signed Sutter's name without his permission.

On August 12, 2007, Jackson approached seventy-eight-year-old Kenneth Bales, who was sitting in his car in the parking lot of a Marsh supermarket in West Lafayette. Jackson, whom Bales found to be "well dressed," told Bales that he could get Bales a discount on his groceries if Bales could demonstrate that he was over seventy years old. *Id.* at 305. Jackson sat down in the passenger seat of Bales's car, and Bales gave Jackson his billfold. At one point, Jackson was turned so that Bales "couldn't see his hands" and took a credit card and a bank card. *Id.*

Later that day, Jackson entered a Village Pantry convenience store in Tippecanoe County and purchased five cartons of Newport cigarettes and a juice with one of Bales's cards, totaling $190.43. Jackson told the clerk that "Newport's [sic] were cheap here and he was from out of town." *Id.* at 311. Jackson did not have Bales's permission to use either of the cards.

On August 21, 2007, Jackson approached sixty-eight-year-old James Morrison while Morrison was shopping at a CVS store on State Road 26 in Lafayette and asked him "what [he] was looking for." *Id.* at 186. Morrison assumed that Jackson, whom he considered to be "well dressed" and who

"seemed to know his way around within the store," was a CVS employee. *Id.* at 187–188. Jackson followed Morrison out of the store while holding a "CVS circular" and told Morrison that "he could get [Morrison] a discount on CVS products" if he were at least fifty-five years old. *Id.* at 187. Jackson sat down in Morrison's car and told him that he needed to see some identification demonstrating that he was at least fifty-five in order to procure "the card necessary to get the discount." *Id.* at 188. Morrison handed Jackson his wallet. Jackson asked Morrison to write something in a notepad, and while Morrison was doing so Jackson removed one of Morrison's credit cards.[4]

Later that day, Jackson approached eighty-four-year-old John Barker and his wife in the parking lot of a Payless grocery store in Tippecanoe County. Jackson was dressed in a white shirt and tie, and the couple assumed that he was an employee of the store. Jackson informed them that the store was offering "special coupons that they [were going to] put out later on in the week" and asked to see identification. *Id.* at 256. Jackson sat down in the back seat of the Barkers' car, took John Barker's wallet, removed Barker's debit card from the wallet, and after about a minute handed the wallet back.

Around 3:30 p.m. that same day, Jackson entered a Speedway in Hobart and made three charges on Barker's credit card totaling over $790 for the purchase of Newport cigarettes, Kool cigarettes, and two gift cards. Each time, Jackson signed Barker's name on the charge slip without Barker's permission.

On August 25, 2007, Lafayette Police Officer Shawn Sherry noticed Jackson at a

---

4. The State presented evidence that Jackson used Morrison's credit card at a Gas America store in Lafayette that same day and charged $82.38 to the card. However, the jury found Jackson not guilty on the forgery count pertaining to this incident. Officer Jay Rosen testified that an attempt to "burn … a copy" of relevant video surveillance at the store was unsuccessful because they "couldn't get anything to play…." Transcript at 226.

Bed Bath & Beyond store and asked Jackson if he would come to the police station for some questioning. He was arrested later that day at the police station. On August 31, 2007, an initial hearing was held, and the State charged Jackson with seven counts of forgery as class C felonies and ten counts of theft as class D felonies. The trial court set the omnibus date for October 17, 2007. On December 20, 2007, the State filed a notice of intention to file an information for being an habitual substance offender, and on January 15, 2008 the State filed a notice of intention to file an information for being an habitual offender.

On March 6, 2008, Jackson filed a motion for severance of counts and argued that "[b]ecause these charges were joined in the information solely on the ground that they are of the same or similar character, Mr. Jackson has a right to have the offenses severed from one another." Appellant's Appendix at 44. On April 11, 2008, the court held a hearing on Jackson's motion. That same day, the court issued an order severing five of the seventeen counts because their "only commonality ... is that there was a credit card theft and subsequent forgery which the Court finds is not sufficiently probative of identity to allow the [c]ounts to be tried together...." *Id.* at 66. Regarding the other twelve counts, the court found:

> [They] can be tried together by virtue of the common *modus operandi* to wit: A scam upon senior citizens in a large retail establishment offering them a senior citizen discount, taking their wallets from them pursuant to that scam, and then removing a credit card from the wallet which is then used later for a modest purchase at another location.

*Id.*

On April 21, 2008, the State filed an information of habitual offender enhancement alleging that Jackson had been convicted of felony forgery in Illinois, fraudulent use of a credit device as a class D felony in Missouri, unlawful use of a credit card as a class 3 felony in Illinois, and felony burglary in Illinois. On May 5, 2008, Jackson filed an objection to the State's notices of intention to file an information for being an habitual offender and for being an habitual substance offender, arguing that the State's filings were late, that the State "failed to state 'good cause' to add the belated habitual offender ... charges," and that "due to the short time period between the filing of the Information and the trial, the Defendant does not have adequate time to prepare for the habitual offender phase, and thus, is substantially prejudiced...." *Id.* at 70–71.

On May 9, 2008, a hearing was held at which Jackson reiterated his argument that there had not been a showing of good cause. The State argued that "as the Court's aware this is something that is fairly typical through our system. We filed the notice of intent to file the habitual offender the same date that we filed the discovery." *Id.* at 76. The State also argued that "the defense has had plenty of notice that the State intended to file" and that "[t]he State typically does not file the actual habitual offender filing until it makes sure it can procure the certified records from other state's [sic]...." *Id.* at 77. Also, at one point Jackson stated: "A brief continuance will work for [us], Your Honor, we simply want the discovery and the evidence that [the] State intends to use during the habitual offender phase." *Id.* at 79. On May 15, 2008, the court issued an order overruling Jackson's objection to the filing of the habitual offender enhancement and reset the jury trial for July 28, 2008.

On September 24, 2008, the State filed a motion to join, asking to add two additional

counts of forgery as class C felonies, which were charges pertaining to Cassman, to the twelve counts that had not been severed, and on September 25, 2008, the court granted the State's motion.

On October 13, 2009, a jury trial commenced. At trial, the charges as amended were as follows: Counts I, III, VII, IX, XI, XIII, and XIV, theft as class D felonies; Counts II, IV, V, VI, VIII, X, and XII, forgery as class C felonies; and Count XV, which was the habitual offender sentence enhancement and which enhanced Count II. Counts I and II pertained to victim Cummings, Counts III–VI pertained to victim Cassman, Counts VII and VIII pertained to victim Sutter, Counts IX and X pertained to victim Bales, Counts XI and XII pertained to victim Morrison, Count XIII pertained to victim Pearlman, and Count XIV pertained to victim Barker.

At trial, evidence consistent with the foregoing facts was presented. On October 15, the jury found Jackson guilty as charged except for Count XII, which was the lone forgery charge pertaining to victim Morrison. Subsequent to the verdicts, Jackson waived his right to a jury trial on the habitual offender enhancement and was found guilty by the trial court. On November 13, 2009, Jackson was sentenced to an aggregate term of forty-five years in the Department of Correction, with the habitual offender enhancement accounting for twelve of the forty-five years.

## I.

The first issue is whether the trial court erred when it denied Jackson's motion to sever the charges. In his brief, Jackson argues that the charges should have been severed by victim because: (A) "the crimes for which he was convicted were not distinctive enough to qualify as being part of a *modus operandi*," and he "does not believe the scam alleged was so unique or so distinctive that it could be recognized as the same wrongdoer;" and (B) even "if severance weren't granted as a matter of right, the court still abused its discretion in not granting the same" because "there is a high probability that the jury applied the evidence of [Jackson's] identity on some of the charges to the question of [his] identity on other charges." Appellant's Brief at 10–11. We handle each of Jackson's arguments separately.

### A. *Severance as a Matter of Right*

First, we address the question of severance as a matter of right. Ind.Code § 35–34–1–9(a) provides that two or more offenses, stated in separate counts, may be joined in the same indictment or information when the offenses "(1) are of the same or similar character, even if not part of a single scheme or plan; or (2) are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan." However, Ind. Code § 35–34–1–11(a) "provides defendants with the right to severance where 'two (2) or more offenses have been joined for trial in the same indictment or information solely on the ground that they are of the same or similar character....'" *Craig v. State*, 730 N.E.2d 1262, 1265 (Ind.2000).

"As the statute explicitly states, severance is required as a matter of right under this provision only if the sole ground for joining is that the offenses are of the same or similar character." *Id.* (citing *Ben–Yisrayl v. State*, 690 N.E.2d 1141, 1145 (Ind.1997), *reh'g denied, cert. denied,* 525 U.S. 1108, 119 S.Ct. 877, 142 L.Ed.2d 777 (1999)). "Offenses may be sufficiently 'connected together' to justify joinder under subsection 9(a)(2) 'if the State can establish that a common *modus operandi* linked the crimes and that the same motive induced that criminal behavior.'" *Id.*

(quoting *Ben–Yisrayl,* 690 N.E.2d at 1145 (citing *Davidson v. State,* 558 N.E.2d 1077, 1083 (Ind.1990)). "Because the trial court has no discretion when severing charges that were joined solely on the ground that they were of the same or similar character, we review the trial court's decision employing a de novo standard." *Booker v. State,* 790 N.E.2d 491, 494 (Ind.Ct.App. 2003) (citing *Pardo v. State,* 585 N.E.2d 692, 693 (Ind.Ct.App.1992)), *trans. denied.*

As noted above, Jackson argues that the crimes "were not distinctive enough to qualify as being part of a *modus operandi*" because they "occurred at separate times over a nearly year[-]long period and involved separate, unrelated victims." Appellant's Brief at 10. Jackson argues that "[t]he thefts occurred at different locations," and that "[t]here is no evidence that the defendant frequented the same stores in committing the thefts or in the subsequent forgeries." *Id.* He asserts that "the crimes were joined simply because of their similar character...." *Id.* at 11.

The State argues that these offenses "bear distinctive and common traits," in that:

> Not all scammers of the elderly impersonate store employees, target their victims in store parking lots, procure access to their victims' wallets with a sham discount offer, and only steal credit and debit cards even though they have the victims' entire wallet. Certainly not every defendant who commits forgery does so to procure vast amounts of Newport brand cigarettes. In addition, while it is true that the offense occurred over a period of time, they were grouped primarily in February of 2007 and the summer of 2007.

Appellee's Brief at 14. The State also argues that "it was not necessary for the State to show that Jackson victimized the same people repeatedly in order to show a unique *modus operandi.*" *Id.* (citing *Waldon v. State,* 829 N.E.2d 168, 172, 174–175 (Ind.Ct.App.2005), *reh'g denied, trans. denied* ).

■ "Modus operandi 'refers to a pattern of criminal behavior so distinctive that separate crimes are recognizable as the handiwork of the same wrongdoer.'" *Craig,* 730 N.E.2d at 1265 n. 1 (quoting *Penley v. State,* 506 N.E.2d 806, 810 (Ind. 1987) (quoting *People v. Barbour,* 106 Ill. App.3d 993, 62 Ill.Dec. 641, 436 N.E.2d 667, 672 (1982)). In *Penley,* the Indiana Supreme Court noted the relevant inquiry:

> [T]he inquiry must be, "Are these crimes so strikingly similar that one can say with reasonable certainty that one and the same person committed them?" Not only must the methodology of the two crimes be strikingly similar, but the method must be unique in ways which attribute the crimes to one person.

*Penley,* 506 N.E.2d at 810.

Here, we find that the evidence presented demonstrated striking similarities beyond the mere "same or similar character" of the offenses. Jackson targeted elderly victims who were shopping at big-box-style or chain stores in Tippecanoe County, and the victims' ages were seventy-eight, eighty-one, eighty-four, seventy-nine, seventy-eight, sixty-eight, and eighty-four years old. Both by his well-dressed appearance and in his words, he represented himself as being a store employee. He approached his victims in the parking lot of the store or within the store itself. In each case, he told his victim that the store was offering special discounts for senior citizens and that he could assist them in obtaining a discount. He sat in the victims' cars, asked for identification to prove that they were over a certain age, and proceeded to write some information down on a notepad. Jackson obtained access to the victims' wallets and was able to remove

one or more credit or debit cards from the wallets.

In each case, Jackson later that day made purchases using the stolen cards mostly at convenience stores and mostly to purchase Newport brand cigarettes or gift cards. For three of the victims, Jackson visited the same Speedway convenience store on Route 26, and for a fourth victim he visited another Speedway convenience store. Also, in at least two of the cases, Jackson explained to the clerk that he was purchasing a large quantity of cigarettes because he was from Chicago and the cigarettes were cheaper than in Chicago.

Jackson cites to *Goodman v. State*, which holds that the trial court erred in not granting severance because "the crimes were not connected together in any apparent manner, as all involved different victims, different property, and different locations over a period of about one month; nor were they part of a single scheme or plan to steal property." 708 N.E.2d 901, 903 (Ind.Ct.App.1999). However, *Goodman* involved two burglaries, a separate instance of theft, and a separate instance of receiving stolen property. *Id.* at 901. In one of the burglaries, Goodman broke into an unoccupied home and stole "boxes of dolls, a musical teapot, and a cookie jar," and in the other burglary he broke into a restaurant to steal frozen food. *Id.* Regarding the theft, Goodman moved a lawn mower to the side of the road and returned later with a truck and took the mower. *Id.* at 901–902. He also possessed a toolbox which had been reported stolen by an acquaintance. *Id.* at 902. Here, unlike in *Goodman*, there is a pattern of criminal behavior so distinctive that separate crimes are recognizable as the handiwork of the same wrongdoer.

We therefore conclude that the trial court did not err in not severing the counts as a matter of right. *See, e.g., Waldon*, 829 N.E.2d at 172, 174–175 (holding that the trial court did not err in denying the defendant's motion to sever five counts of burglary as class C felonies and five counts of theft as class D felonies, among other charges, as a matter of right, where defendant would occasionally "break and gain entry into businesses in the Lafayette area ...").

B. *Severance to Promote a Fair Determination of Jackson's Case*

Next, we examine whether Jackson was nevertheless entitled to severance of the charges in order to promote a fair determination of the merits of his case. Where severance is not a matter of right, Ind.Code § 35–34–1–11(a) provides that:

[T]he court, upon motion of the defendant or the prosecutor, shall grant a severance of offenses whenever the court determines that severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense considering:

(1) the number of offenses charged;

(2) the complexity of the evidence to be offered; and

(3) whether the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.

A trial court's refusal to sever charges under these circumstances is reviewed for an abuse of discretion. *Craig*, 730 N.E.2d at 1265 (citing *Kahlenbeck v. State*, 719 N.E.2d 1213, 1216 (Ind.1999)). On appeal, a defendant "must show [that] 'in light of what actually occurred at trial, the denial of a separate trial subjected him to ... prejudice.'" *Harvey v. State*, 719 N.E.2d 406, 409 (Ind.App.1999) (quoting *Brown v. State*, 650 N.E.2d 304, 306 (Ind.1995) (quoting *Hunt v. State*, 455 N.E.2d 307, 312 (Ind.1983))).

Jackson argues that "there is a high probability that the jury applied the evidence of [his] identity on some of the charges to the question of [his] identity on other charges." Appellant's Brief at 11. Jackson argues that "the [S]tate was allowed to bolster its weaker cases by the similarity they had to its stronger cases," and that "[b]y being tried together, [he] was likely convicted of many charges that could have been defeated separately because of weak identification on the thefts or insufficient evidence showing he actually committed the forgeries alleged." *Id.* at 11–12. Jackson points to evidentiary gaps, including that some of the victims could not identify Jackson.

Here, although there were a number of charged offenses, the evidence presented was not overly complex. The prosecutors presented their evidence victim-by-victim, and such evidence consisted of witness testimony, surveillance footage pertaining to individual uses of victims' credit cards, and the receipts for the goods purchased. For each victim, identification evidence was presented, including identification by the victim, by a clerk at the store where Jackson used the victim's card, or in the form of video surveillance footage. The prosecutor in his closing argument summarized the offenses victim-by-victim. The counts, and the victims they pertained to, were clearly set out in jury instructions 4.31 and 4.431. Also, the jury acquitted Jackson on Count XII, which was the forgery charge against victim Morrison, demonstrating that they were able to parse the evidence presented and apply the law intelligently to each individual offense. *See Harvey,* 719 N.E.2d at 409–410 ("Given that Harvey was acquitted of all charges stemming from the first robbery, it appears the jury was able to distinguish the evidence and apply the law intelligently to each offense."). We therefore conclude that the court did not abuse its discretion when it denied Jackson's motion to sever. *See id.* at 410 (noting that "it has long been the law of this state that acquittal of charges from one joined offense makes the misjoinder unavailable for reversal of the judgment") (citing *Myers v. State,* 92 Ind. 390, 395 (1883)).

### II.

■ The second issue is whether the trial court erred in allowing the State to file a belated habitual offender information. Ind.Code § 35–34–1–5(e) provides:

> An amendment of an indictment or information to include a habitual offender charge under IC 35–50–2–8 . . . must be made not later than ten (10) days after the omnibus date. However, upon a showing of good cause, the court may permit the filing of a habitual offender charge at any time before the commencement of the trial.

Jackson requests that we reverse his habitual offender enhancement because the filing was untimely and there was no showing of good cause.

The omnibus date in this case was October 17, 2007. On December 20, 2007, the State filed a notice of intention to file an information for being a habitual substance offender, and on January 15, 2008 the State filed a notice of intention to file an information for being a habitual offender. Then, on April 21, 2008, the State filed the habitual offender enhancement alleging that Jackson had been convicted of felony forgery in Illinois, fraudulent use of a credit device as a class D felony in Missouri, unlawful use of a credit card as a class 3 felony in Illinois, and felony burglary in Illinois. On May 5, 2008, Jackson filed an objection, arguing that the State's filings were late, that the State "failed to state 'good cause' to add the belated habitual offender . . . charges," and that "due to

the short time period between the filing of the Information and the trial, the Defendant does not have adequate time to prepare for the habitual offender phase, and thus, is substantially prejudiced...." Appellant's Appendix at 70–71.

On May 9, 2008, the court held a hearing and the State argued that "as the Court's aware [sic] this is something that is fairly typical through our system. We filed the notice of intent to file the habitual offender the same date that we filed the discovery." *Id.* at 76. The State also argued that "the defense has had plenty of notice that the State intended to file" and that "[t]he State typically does not file the actual habitual offender filing until it makes sure it can procure the certified records from other state's [sic]...." *Id.* at 77. Also, at one point Jackson noted to the court that "[a] brief continuance will work for [us], Your Honor, we simply want the discovery and the evidence that [the] State intends to use during the habitual offender phase." *Id.* at 79. On May 15, 2008, the court issued an order overruling Jackson's objection.

 "By permitting the State to file the habitual offender count, the trial court impliedly found good cause." *Land v. State*, 802 N.E.2d 45, 53 (Ind.Ct.App.2004), *trans. denied.* We review a trial court's finding of good cause for an abuse of discretion. *Id.* (citing *Watson v. State*, 776 N.E.2d 914, 918 (Ind.Ct.App.2002)). "An abuse of discretion occurs only where the decision is clearly against the logic and effect of the facts and circumstances.'" *Id.* (quoting *Palmer v. State*, 704 N.E.2d 124, 127 (Ind.1999)).

Here, the State argued that it had demonstrated good cause for the delay in filing the habitual offender count because it was unsure whether it would be able to obtain the records necessary to charge Jackson as an habitual offender. Also, as argued by the State, Jackson did not demonstrate that he was prejudiced by the late filing of the habitual offender count. Indeed, the State's argument is even more convincing at this stage, as Jackson's trial did not commence for another seventeen months following the May 9, 2008 hearing. "A defendant who challenges the State's filing of an habitual offender allegation on the ground that it is filed outside of the time limit must demonstrate that he was prejudiced." *Land*, 802 N.E.2d at 53 (citing *Daniel v. State*, 526 N.E.2d 1157, 1162 (Ind.1988) (discussing Ind.Code § 35–34–1–5(b)(1))). "The purpose of Ind.Code § 35–34–1–5(e) is to allow a defendant sufficient time to prepare a defense for the habitual offender charge." *Id.* (citing *Watson*, 776 N.E.2d at 917). Jackson requested a brief continuance which was granted, and Jackson had seventeen months between the hearing and the jury trial to prepare a defense. Because Jackson has not presented any explanation of how he was prejudiced by the timing of the additional charge, his request that we reverse his habitual offender enhancement is denied. *See Land*, 802 N.E.2d at 53–54.

For the foregoing reasons, we affirm Jackson's convictions.

Affirmed.

DARDEN, J., and BRADFORD, J., concur.