## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 30 2016, 5:32 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Lisa M. Johnson | Gregory F. Zoeller |
| Brownsburg, Indiana | Attorney General of Indiana |
| | Chandra K. Hein |
| | Deputy Attorney General |
| | Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Don Johnson, | June 30, 2016 |
| *Appellant-Defendant,* | Court of Appeals Case No. 49A04-1511-CR-1866 |
| v. | Appeal from the Marion Superior Court |
| State of Indiana, | The Honorable Lisa Borges, Judge |
| *Appellee-Plaintiff.* | Trial Court Cause No. 49G04-1402-FA-9708 |

**Riley, Judge.**

## STATEMENT OF THE CASE

[1] Appellant-Defendant, Don Johnson (Johnson), appeals the denial of his motion to sever.

[2] We affirm.

## ISSUE

[3] Johnson raises one issue on appeal, which we restate as: Whether the trial court abused its discretion in denying Johnson's motion for severance.

## FACTS AND PROCEDURAL HISTORY

[4] On January 21, 2014, T.W. was meeting her friends, A.L. and T.J., at an apartment on the corner of 46th and Winthrop, in Indianapolis, Indiana. When she arrived at that location, she tried calling her friends for the specific address of where they were meeting, but her calls went unanswered. T.W. was not sure which apartment her friends were in, so she walked into the apartment building to look for them. As she was walking in, Johnson held the door open for her. T.W. knew Johnson as "Tony" and she described him as a friend from the "neighborhood." (Transcript p. 30). As T.W. began walking down the hallway, Johnson followed her and tripped her. T.W. fell, her knee popped, and she hit her head on the floor. While on the ground, Johnson grabbed T.W.'s cell phone. When T.W. looked up, she saw Johnson holding a box cutter in his hand. Johnson declared that he wanted "some free pussy" and he proceeded to drag T.W. to an adjacent empty apartment. (Tr. p. 34). Johnson directed T.W. to take off her clothes; however, T.W. was unable to since her

knee was hurting. T.W. informed Johnson that if he wanted her clothes off, "he had to do it himself." (Tr. p. 37). Johnson told T.W. to remain quiet and if she screamed, he was going to kill her. After removing T.W.'s pants and underwear, Johnson removed his pants. T.W. begged Johnson to use a condom, which he did. With one hand on T.W.'s neck, and the other holding the box cutter, Johnson penetrated T.W.'s vagina with his penis. At some point, Johnson removed his hand from T.W.'s neck and pulled T.W.'s "titty out [] and licked it." (Tr. p. 40). After three humps or so, Johnson got up and instructed T.W. to get dressed. Because T.W. was incapable of dressing herself, she asked Johnson to help her. T.W. could not walk, so Johnson aided her out of the apartment building and he gave back her cell phone. By that time, A.L. had arrived and was in her car waiting. T.W. told A.L. what had happened and she requested A.L. to take her to the hospital. T.W. had a complete physical examination, including an x-ray of her right knee and a sexual assault examination. No sign of injury was detected on the x-ray.

[5] A couple of weeks later, on February 5, 2014, A.O. had a date to meet a man named Tony, who was later identified as Johnson. A.O. and Johnson met through a phone line dating site. On that day, Johnson arrived at A.O.'s house at around 8:30 p.m. with a bag of peanuts and a bottle of liquor. A.O.'s three-year-old son was asleep at the time. The couple drank the liquor, talked, and watched a movie. As the night progressed, Johnson wanted to smoke a cigarette in the living room, but A.O. informed him that she did not allow it, so they both went into the bathroom to smoke. While in there, Johnson "flashed

himself and showed his penis." (Tr. p 170). A.O. told Johnson, "this is not what I'm looking for. You know I'm looking for love. You know, I at least want to get to know . . . you first before I . . . have sex . . . ." (Tr. p. 170). The two went back to the living room and continued to watch the movie while talking.

[6] After a while, A.O. noticed that Johnson was acting strange, and A.O. felt as if Johnson wanted to have sex with her or scope out her home so that he could rob her. Feeling troubled, she asked Johnson to leave. After Johnson left, A.O. called him to figure out why he was behaving oddly. The two argued on the phone, and after about twenty minutes, Johnson returned to A.O.'s apartment and asked A.O. to let him in as he wanted to apologize. When A.O. opened the door, Johnson pushed his way through and A.O. sat down waiting for an apology. Instead, Johnson shouted, "[b]itch get up" and he pulled out a pocket knife and told A.O. to open her mouth. (Tr. p. 174-75). With the knife inside A.O.'s mouth, Johnson forced A.O. to go to her bedroom. Johnson threatened A.O. by telling her that if she did not comply with his commands, he would kill her three-year-old son. While forcing her into the bedroom, Johnson yelled, "Bitch, stop screaming. I'm going to kill you and your son." (Tr. p. 175). In the process of that ordeal, the knife sliced A.O.'s mouth.

[7] In the bedroom, Johnson pushed A.O.'s face down on the bed, and he hit her several times in the head using both fists. According to A.O., it hurt and she "kind of like blacked out for a minute and then I came back to myself." (Tr. p. 176). When A.O. regained consciousness, he found Johnson calling her "all

kinds of fat Bs . . . [a]nd he was like, you think you're too good, and stuff. And then he got out this rope and told me to put my hands behind my back." (Tr. p. 176). As A.O. stood up to put her hands together, she pushed Johnson to the side and ran out of her apartment. A.O. ran to a neighbor's apartment and requested that they call the police. As she ran for help, A.O. could hear Johnson ransacking her apartment. Shortly thereafter, A.O. returned to her apartment to retrieve her son, but she was met by Johnson who came running out of the apartment. Johnson struck A.O. in the head and she fell on her knees. As he ran out, Johnson grabbed A.O.'s cell phone. After Johnson had disappeared, the police arrived. On February 13, 2014, Detective Gary Smith of the Indianapolis Metropolitan Police Department (Detective Smith) went to A.O.'s house and presented a photo array, and immediately A.O. identified Johnson, being the man that assaulted her.

[8] On February 28, 2014, the State charged Johnson with Count I, rape, a Class A felony; Count II, rape, a Class A felony; Count III, criminal deviate conduct, a Class A felony; Count IV, criminal deviate conduct, a Class A felony; Count V, criminal confinement, a Class B felony; Count VI, intimidation, a Class C felony; Count VII, criminal confinement, a Class B felony; Count VIII, battery, a Class A misdemeanor; Count IX, battery, a Class A misdemeanor; Count X, robbery, a Class B felony; Count XI, sexual battery, a Class C felony; Count XII, sexual battery, a Class C felony; Count XIII, rape, a Class A felony; Count XIV, rape, a Class A felony; Count XV, burglary, a Class A felony; Count XVI, criminal confinement, a Class B felony; Count XVII, intimidation, a Class C

felony; Count XVIII, battery, a Class A misdemeanor; Count XIX, battery, a Class C felony; and Count XX, robbery, a Class B felony.

[9] Counts I through VI were in relation to a prior incident on October 15, 2013. The probable cause affidavit stated that seventeen-year-old S.H. was walking to her friend's house at around 9:00 p.m., and Johnson, who was armed with a knife, approached S.H. from behind, wrapped his arm around S.H.'s waist, and stuck a knife to her side. The affidavit further stated that Johnson walked S.H. backwards for some distance and ordered her to get into a van. S.H. was fearful and she pleaded with Johnson to let her go. Johnson stated that he would kill her if she said anything. Johnson forcefully penetrated S.H.'s vagina using his penis. After raping S.H., Johnson ordered S.H. to put her pants back on, and told her to stop crying or he would kill her. Johnson drove S.H. a couple of blocks before stopping at East 37th Street and Broadway Avenue, in Indianapolis, Indiana. S.H. ran home, told her sister and mother that she had been raped, and, in turn, S.H.'s mother called the police.

[10] For the incident involving T.W., the State charged Johnson with Counts VII through XIV, which included: criminal confinement, a Class B felony; two Counts of battery, Class A misdemeanors; robbery, a Class B felony; two Counts of sexual battery, Class C felonies; and two Counts of rape, Class A felonies. For the incident involving A.O., the State charged Johnson with Counts XV through XX, which included: burglary, a Class A felony; criminal confinement, a Class B felony; intimidation, a Class C felony; battery, a Class A misdemeanor; battery, a Class C felony; and robbery, a Class B felony.

[11] On September 15, 2014, Johnson filed a motion to sever, arguing that the charges relating to S.H., T.W., and A.O., ought to be tried in three separate trials. Specifically, Johnson claimed that he would be denied a fair determination of his guilt or innocence, and that the trial court had the discretion pursuant to I.C. § 35-34-1-11, to order for the severance of the charges. The State did not object to the severance of Counts I through VI, however, it objected to the severing of Counts VII through XIV relating to T.W., and Counts XV through XX relating to A.O. Specifically, the State argued that the facts and circumstances of the charges relating to T.W. and A.O., were sufficiently connected together to demonstrate a common *modus operandi, i.e.*, T.W. knew Johnson as Tony, and that Johnson identified himself as Tony to A.O. The trial court granted Johnson's motion only to sever Counts I through VI, but denied severing Counts VII through XX.

[12] A bifurcated jury trial was held for Counts VII through XX on September 21-22, 2015.[1] Also, Johnson renewed his motion for severance, and, again, the

---

[1] At the start of trial, Counts VII through XX, were renumbered as Counts I through XIV. We note that the abstract of the judgement correlates to the Information. However, for the purpose of clarity, we will avoid further reference to the numbered Counts in our opinion hereon, and we will only refer to the offenses that pertain to each victim.

trial court denied it. At the close of the State's case, Johnson moved for a directed verdict on battery, a Class A misdemeanor; and robbery, a Class B felony, against T.W. The trial court only granted Johnson a directed verdict on the misdemeanor battery.

[13] Johnson's defense was that he met T.W. through T.W.'s boyfriend. Johnson admitted the he saw T.W. on January 21, 2014, and had met with T.W. and T.W.'s boyfriend for the purpose of selling marijuana. He further testified that he got into a fight with T.W.'s boyfriend after T.W.'s boyfriend offered him counterfeit money. Johnson claimed that T.W. hit him while he was fighting with her boyfriend, and in the process of the scuffle, he grabbed, pushed, and spat on T.W.

[14] With regards to A.O., Johnson admitted that he had met A.O. on a phone chat line site. Johnson claimed that A.O. had indicated in the site that "she was looking for someone that was being generous" which Johnson recognized as code for prostitution. (Tr. p. 321). Johnson stated that he had agreed to meet with A.O. in her apartment on February 5, 2014. Johnson stated that

> the deal was for -- to exchange sex -- money for sex. And it was -- oral sex is what she was supposed to be giving me. And I kept on asking her, What's up? What's up? And she was like, let's not rush. We got all night. And I'm like, I got to get back home to my mom, because I take care of my mom. She's at dialysis three times a week. So I'm like, I ain't got all night. I got to get back home. So I'm like, You playing. So I'm like, I got to go. So I gets up. I leave. So when I leave, I gets ready to leave. I get in the car and getting ready to leave and everything, and she calls me right back and says, Okay. Okay.

(Tr. pp. 330-31). Johnson claimed that when he returned to A.O.'s apartment, A.O. performed fellatio on him, and in the process, he pulled off A.O.'s wig and he began laughing at her. According to Johnson, A.O. became upset and stated, "[W]hat the fuck are you laughing at? I'm like you. And she got to calling me bitches and motherfucker . . . ." (Tr. p. 332). Johnson testified that he was to pay A.O. $30 for a full fellatio, but because it was not completed, he "peeled off $15.00 and threw it on the table and said. There go your money. She was like, no, motherfucker, you owe me $30." (Tr. p. 332). According to Johnson, A.O. was angry, and she blocked the door demanding full pay. Johnson claimed that there was a tussle by the door but he elbowed his way out of A.O.'s apartment.

[15] The jury acquitted Johnson of all but one of the charges involving T.W., *i.e.*, a Class A misdemeanor battery. With regards to the crimes against A.O., the jury found Johnson guilty of five of the six Counts against A.O. Specifically, Johnson was found guilty of one Count of burglary, one Count of criminal confinement, one Count of intimidation, and two Counts of battery. The jury returned a not guilty finding on robbery, a Class B felony.

[16] On October 21, 2015, the trial court conducted a sentencing hearing. At the request of the State, the trial court dismissed Counts one through six relating to S.H. The trial court declined to enter convictions for all charges except for the misdemeanor, battery against T.W., and the Class A burglary offense against

A.O.[2]  The trial court sentenced Johnson to concurrent sentences of one year for the battery offense and nine years for the burglary offense.

[17]  Johnson now appeals.  Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

[18]  Indiana Code section 35-34-1-9(a), allows joinder of offenses in the same indictment or information, with each offense stated in a separate count, when the offenses:

> (1) are of the same or similar character, even if not part of a single scheme or plan; or

> (2) are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan.

[19]  If two or more offenses are joined solely because they are of the same or similar character, as permitted in subsection 9(a)(1), a defendant is entitled to severance as a matter of right, and the trial court has no discretion to deny a defendant's motion.  Ind. Code § 35-34-1-11(a); *Jackson v. State*, 938 N.E.2d 29, 35 (Ind. Ct. App. 2010), *trans. denied*.  However, if the State can establish that a common

---

[2] Due to double jeopardy concerns, the trial court vacated four of Johnson's convictions of the crimes committed against A.O.  Specifically, the trial court vacated Johnson's convictions of criminal confinement, intimidation, and two counts of battery.

*modus operandi* linked the crimes and that the same motive induced that criminal behavior, then the offenses are sufficiently connected that joinder is justified under subsection 9(a)(2), and a defendant is not entitled to severance as a matter of right. *See Garcia-Torres v. State*, 949 N.E.2d 1229, 1232 n. 5 (Ind. 2011).

[20] Where severance is not a matter of right, a defendant may request, and the trial court shall grant, a severance if the trial court "determines that severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense." I.C. § 35-34-1-11(a).

[21] Johnson was accused of committing various offenses against three different complaining witness on three separate dates. The Counts relating to S.H., the first victim, were severed. However, the Counts relating to T.W. and A.O. were not severed because, in both instances, Johnson used Tony as a pseudonym, thus depicting a common *modus operandi*. Johnson concedes that he was not entitled to severance as a matter of right; however, he argues that the "number of charges and the similarities among the various charges likely made it difficult for the jury to distinguish the evidence and apply the law fairly and intelligently to each offense." (Appellant's Br. p. 11). Accordingly, Johnson maintains that although he was acquitted of seven of the fourteen charges against him, he may have been acquitted of all fourteen had he been granted separate trials. The State, in turn, argues that Johnson's acquittal of seven of the fourteen charges against him, "demonstrates that the jury was able

to parse the evidence and apply the law intelligently." (Appellee's Br. p. 12). We agree.

[22] The State presented the evidence, victim-by-victim, which also included DNA evidence and photographs. The State, in its closing argument, summarized the offenses victim-by-victim. The Counts and the victims of each Count were clearly set out in the jury instructions; and, throughout trial, the jurors asked several questions that indicated they understood the evidence and could distinguish between the different victims. Although there were numerous charges, our review of the evidence reveals that the evidence offered was not complex, and the trier of fact would have been able to apply the law intelligently as to each offense. Accordingly, we find no evidence, nor does Johnson point us to any, where the jury had difficulty distinguishing evidence as it related to each of the fourteen Counts he was charged with or that the jury had difficulty applying the law to each offense. Johnson has also failed to show that he was prejudiced by the denial of separate trials for the crimes against T.W. and A.O. In light of the foregoing, we conclude that the trial court did not abuse its discretion in denying Johnson's motion to sever.

## CONCLUSION

[23] Based on the foregoing, we conclude that the trial court acted within its discretion in denying Johnson's motion for severance.

[24] Affirmed.

[25] Kirsch, J. and Pyle, J. concur