Michael R. FLANDERS, Appellant–
Petitioner,

v.

STATE of Indiana, Appellee–
Respondent.

No. 48A02–1009–PC–1019.

Court of Appeals of Indiana.

Sept. 19, 2011.

Rehearing Denied Nov. 14, 2011.

734

Michael R. Flanders, Anderson, IN, Appellant Pro Se.

Gregory F. Zoeller, Attorney General of Indiana, Karl M. Scharnberg, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

Michael R. Flanders, pro se, appeals from the denial of his petition for post-conviction relief. Flanders claims that counsel was ineffective at his trial for sexual misconduct with a minor because: (1) he offered the text of a chat between the victim and her friend into evidence although it appeared to be altered and its authenticity was not established; (2) he did not support his Indiana Evidence Rule 404(b) objections with authority that would show that the intent exception did not apply; (3) he did not make use of evidence that would impeach the victim; and (4) he did not object to the authenticity of documents that were admitted during the repeat sex offender phase of the trial. Flanders also claims that appellate counsel was ineffective because he did not raise any of these issues on appeal as fundamental error or ineffective assistance of trial counsel. We conclude that admission of the chat served a legitimate trial strategy, that the evidence objected to on Evidence Rule 404(b) grounds was not inadmissible, that trial counsel adequately cross-examined the victim, and that Flanders has not shown that he was prejudiced by the admission of any unauthenticated documents. As such, we conclude that his trial counsel was not ineffective. Likewise, we conclude that appellate counsel was not ineffective.

After Flanders was convicted of sexual misconduct with a minor, amendments to the sex offender registry statutes reclassified him as a sexually violent predator ("SVP"). In his petition for post-conviction relief, Flanders also challenged his designation as an SVP on four grounds: (1) classification as an SVP can happen only at sentencing; (2) the Department of Correction ("DOC") violated the separation of powers provisions of the Indiana Constitution by reclassifying him as an SVP; (3) reclassification without prior notice and a hearing violated his right to due process under both the federal and state constitutions; and (4) the amended version of the sex offender registry statutes violates the Indiana Constitution's prohibition of ex post facto laws.

The State does not address these arguments, but asserts that the post-conviction court's denial of these claims was correct because Flanders did not comply with Indiana Code Section 11–8–8–22 (titled "Petition to remove designation or register under less restrictive conditions"). On the contrary, Flanders complied with the version of Indiana Code Section 11–8–8–22 that was in effect at the time that he filed his petition for post-conviction relief, and we see no reason why a petition filed pursuant to that section may not be addressed in the same proceeding as a petition for post-conviction relief.

On the merits of Flanders's arguments concerning his SVP status, we conclude that our supreme court has already rejected Flanders's first three arguments. However, we conclude that a 2007 amendment that eliminated his eligibility to petition the court for termination of his SVP status is an ex post facto law that is unconstitutional as applied to Flanders. We also conclude that this violation can be remedied by reinstating his eligibility to petition for a change in status after his initial ten-year requirement to register has passed. Therefore, we affirm the post-conviction court in part and reverse in part.

## Facts and Procedural History

In May 2005, H.P. was fourteen years old and lived with her aunt and uncle. Flanders and his wife lived across the street from H.P.'s aunt and uncle, and H.P. sometimes babysat the Flanderses' son. On May 10, 2005, H.P. babysat while Flanders and his wife went to a movie. Because the Flanderses would be getting home late, H.P. planned to spend the night at their house. After the Flanderses returned home, they watched a movie with H.P.

Flanders's wife went to bed after the movie, but H.P. and Flanders stayed up to watch another movie. H.P. was sitting in the bend of a sectional couch. Flanders was sitting in a chair, and H.P. noticed that he was rubbing his leg and staring at her. Flanders got up to turn on a light that stood in the corner in the space between the wall and the bend of the couch; thus, Flanders leaned over H.P. to turn on the light. H.P. noticed that Flanders had an erection.

A while later, Flanders said that the light was too bright and got up to turn it off. He asked H.P. to unbutton her shirt, which she did. Underneath her shirt, H.P. was wearing a tank top which left part of her "cleavage" exposed. Petitioner's Ex. A at 30.[1] Flanders rubbed her on her arms, stomach, and chest. Flanders did not touch her underneath her tank top, but did touch the exposed cleavage. Flanders asked her to make herself "finish," which she understood to mean masturbate. *Id.* at 29. H.P. told Flanders that she did not want to because she was on her period.

After H.P. went home, she had a conversation with her friend, K.B., via Instant Messenger. One of H.P.'s sisters noticed that H.P. was trying to hide the conversation and told their uncle, I.S., about it.

I.S. found the chat, printed it out, and confronted H.P. about it. Thereafter, the incident was reported to the police.

Flanders was charged with class C felony sexual misconduct with a minor. Due to a previous conviction of class C felony child molesting, Flanders was also charged with being a repeat sex offender.

Flanders's case was tried to the bench on April 25 and 26, 2007. H.P. testified to the events described above. She also stated that Flanders's erect penis brushed her forehead when he leaned over her, but she could not recall whether that happened the first or second time that he went over to the light. H.P. admitted that she had a "crush" on Flanders. *Id.* at 19. The prosecutor asked her whether Flanders did anything to encourage that. Flanders objected, arguing that the question called for character evidence that is inadmissible pursuant to Indiana Evidence Rule 404(b). The prosecutor stated that H.P. would not be testifying about any criminal conduct, that her answer would provide context, and that it related to Flanders's motive and intent. The court asked, "You don't expect the answers to show the defendant to be a bad person but simply to show the relationship of the parties?" *Id.* at 20. The prosecutor responded affirmatively, and the court overruled the objection. H.P. testified that there had been occasions when Flanders held her hand while they were alone together in his car. Later in her testimony, H.P. described an incident where she and K.B. were playing with Flanders's tablet computer. H.P. wrote that Flanders "was cute or something to that nature," and Flanders saw it. *Id.* at 33. Flanders objected to this line of questioning on Evidence Rule 403 and 404(b) grounds, but the objection was overruled.

---

1. Exhibit A from the post-conviction proceed- ing contained the entire trial record.

On cross-examination, Flanders noted that H.P. had testified that he was wearing pajamas, but the police report stated that he was wearing sport pants. H.P. explained that Flanders changed his clothes during the course of the evening and that she thought that she had told the officer that. Flanders established that there was no other way for him to approach the light. Flanders also asked whether she remembered telling the police that Flanders forced her hand down her pants. She said, "No," and then explained that Flanders "pushed it but it wasn't like he had grabbed it but he wasn't forceful about it." *Id.* at 40. Flanders had her read from her deposition where she was asked, "He didn't try and force your hand anywhere?" and she said, "I don't think so." *Id.* at 41. On redirect, the prosecutor asked H.P. if Flanders attempted to guide her hand, and she replied affirmatively.

K.B. also testified about the incident when H.P. wrote something about Flanders being "hot" or "cute" on his computer. *Id.* at 72. K.B. stated that when Flanders saw it, he smiled and laughed. This testimony was admitted over Flanders's objection on Evidence Rule 404(b) grounds.

I.S. testified that prior to May 10, 2005, he had noticed that H.P. was talking about Flanders a lot, and he got the impression that H.P. had a crush on him. I.S. talked to Flanders about it and told him to be careful not to encourage her. On cross-examination, Flanders asked I.S. about H.P.'s level of sophistication in sexual matters. I.S. stated, "I would say[ ] she had some ideas, but fairly naive ideas I would say.... I don't know that she would know the whole thing of sex." *Id.* at 65. Flanders then showed I.S. a document, which I.S. identified as the chat between H.P. and K.B. that he had printed out, and it was admitted as Defendant's Exhibit 1.

Flanders pointed out that H.P. said that they did not kiss or "do it." *Id.* at 68. On redirect, the prosecutor asked:

"I'm assuming Mr. Lawrence [defense counsel] asked you about this instant message because one interpretation of it might be that [H.P.] is a little more ... sexually sophisticated and knowledgeable than maybe you had said.... I thought I heard you saying that you thought that [H.P.] was maybe a little inexperienced and naive at that time two years ago. Is that what you were saying[?]"

*Id.* at 69. I.S. responded: "Yes ... even the conversation there, that IM conversation, did you do it? Well, no, I don't think so. There was some unsurety [sic] as to what exactly had happened the night before as far [as] the level of ... quote/unquote doing it." *Id.*

Flanders and his wife both testified that they did not realize that H.P. had a crush on Flanders. Flanders denied ever touching H.P. when they were alone together in his car and denied having seen what H.P. wrote on his tablet computer about him. He denied that he touched her at any time on the evening of May 10, 2005, that he had an erection that evening, and that he asked H.P. to unbutton her top. On cross-examination, the prosecutor asked, "The events of that evening, you would not say that [H.P.] simply misunderstood your intentions, she misunderstood an innocent brushing by. Your testimony is, those events that she described simply didn't happen?" *Id.* at 120. Flanders replied, "That's correct, sir." *Id.* The prosecutor asked Flanders what would motivate H.P. to lie. Flanders stated that H.P. had told him that K.B. was in a relationship with an older man and might be pregnant. Flanders asked H.P., "Doesn't [that] bother you?" and she said no. *Id.* at 98. Flanders speculated that H.P. gathered from

this conversation that he would not be interested in a relationship with her.

At the conclusion of the first phase of the trial, the trial court credited H.P.'s testimony and found Flanders guilty of sexual misconduct with a minor. The second phase of the trial addressed the repeat sex offender charge. The State's only evidence was five exhibits from a criminal case dating back to 1996, which were admitted without objection. The exhibits included documents that purported to be an information charging Flanders with two counts of child molesting, the probable cause affidavit, the chronological case summary, the sentencing order, and documentation from the Hamilton County Sheriff's Department that included Flanders's photograph and fingerprints. Based on this evidence, the trial court found that Flanders was a repeat sex offender.

Flanders was sentenced to ten years on May 29, 2007. At the sentencing hearing, neither Flanders, nor the prosecutor, nor the court addressed whether Flanders was required to register as an SVP. Flanders filed a direct appeal, in which the sole issue raised was the sufficiency of the evidence. We affirmed in an unpublished memorandum decision issued on February 29, 2008. *Flanders v. State*, No. 48A02–0707–CR–550, 881 N.E.2d 735, 2008 WL 540817 (Ind.Ct.App. Feb.29, 2008), *trans. denied.*

On October 22, 2009, Flanders filed a pro se petition for post-conviction relief. Flanders alleged that trial counsel provided ineffective assistance because: (1) he offered the chat between H.P. and K.B. into evidence although it appeared to be altered and its authenticity was not established; (2) he did not support his Evidence Rule 404(b) objections with authority that would show that the intent exception did not apply; (3) he did not make use of evidence that would impeach H.P.; and (4) he did not object to unauthenticated documents that were admitted during the repeat sex offender phase of the trial. Flanders alleged that appellate counsel also provided ineffective assistance because he did not raise any of these alleged trial errors as a fundamental error or ineffective assistance of trial counsel claim. Finally, Flanders alleged that the DOC had, without authority, classified him as an SVP and that his reclassification violated the due process clauses of the United States and Indiana Constitutions and the ex post facto clause of the Indiana Constitution.[2]

On August 23, 2010, the post-conviction court entered an order denying Flanders's petition for post-conviction relief. The court concluded that the records admitted in the repeat sex offender portion of the trial were properly certified and therefore self-authenticating. The court concluded that there was no ex post facto violation based on our supreme court's decision in *Jensen v. State*, 905 N.E.2d 384 (Ind.2009). The court also concluded that to address Flanders's SVP claims, "further notice and hearing is required by the recent statutory provision effective March 24, 2010, under I.C. 11–8–8–22." Appellant's App. at 172. The decision discussed trial counsel's cross-examination of I.S., but not H.P., who was the focus of Flanders's argument. The decision also did not address the admission of the chat or the evidence that Flanders argued should have been excluded pursuant to Evidence Rule 404(b).[3] Flanders now appeals.

---

2. Flanders raised some additional claims in his petition for post-conviction relief that he has not pursued on appeal.

3. We note that the post-conviction court is required to make findings on all issues presented. Ind. PostConviction Rule 1(6). However, even if the post-conviction court fails to

## Discussion and Decision

■■■ The petitioner in a post-conviction proceeding bears the burden of proving the grounds for relief by a preponderance of the evidence. *Henley v. State*, 881 N.E.2d 639, 643 (Ind.2008). Flanders is appealing a negative judgment; therefore, he must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Id.* at 643–44. "Although we do not defer to the postconviction court's legal conclusions, a post-conviction court's findings and judgment will be reversed only on a showing of clear error—that which leaves us with a firm conviction that a mistake has been made." *State v. Damron*, 915 N.E.2d 189, 191 (Ind.Ct.App.2009), *trans. denied.*

### I. Ineffective Assistance of Counsel

■■■ To prevail on a claim of ineffective assistance of trial counsel, Flanders must show both that counsel's performance fell below an objective standard of reasonableness and that the deficient performance so prejudiced him that he was denied a fair trial. *Coleman v. State*, 694 N.E.2d 269, 272 (Ind.1998) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). There is a strong presumption that counsel rendered adequate assistance. *Id.* "Evidence of isolated poor strategy, inexperience or bad tactics will not support a claim of ineffective assistance." *Id.* at 273. "Counsel's performance is evaluated as a whole." *Lemond v. State*, 878 N.E.2d 384, 391 (Ind. Ct.App.2007), *trans. denied.* To establish the prejudice prong of the test, the defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Sims v. State*, 771 N.E.2d 734, 741 (Ind.Ct.App. 2002), *trans. denied.* "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "Prejudice exists when the conviction or sentence resulted from a breakdown in the adversarial process that rendered the result of the proceeding fundamentally unfair or unreliable." *Coleman*, 694 N.E.2d at 272.

■■■ To prevail on a claim of ineffective assistance of appellate counsel, the defendant must also show that counsel's performance was deficient and resulted in prejudice. *McCann v. State*, 854 N.E.2d 905, 914 (Ind.Ct.App.2006). Our supreme court has recognized three types of ineffective assistance of appellate counsel: (1) denial of access to appeal; (2) failure to raise issues that should have been raised; and (3) failure to present issues well. *Wrinkles v. State*, 749 N.E.2d 1179, 1203 (Ind.2001), *cert. denied.*

When a petitioner claims the denial of effective assistance of appellate counsel because counsel did not raise issues the petitioner argues should have been raised, reviewing courts should be particularly deferential to counsel's strategic decision to exclude certain issues in favor of others, unless such a decision was unquestionably unreasonable. But this does not end our analysis. Even if we determine that counsel's choice of issues was not reasonable, a petitioner must demonstrate a reasonable probability that the outcome of the direct appeal would have been different in order to prevail.

*Taylor v. State*, 840 N.E.2d 324, 338 (Ind. 2006) (citations and quotation marks omit-

make findings, we may proceed with our review if the facts underlying the claims are not in dispute. *Minor v. State*, 641 N.E.2d 85, 88 (Ind.Ct.App.1994), *trans. denied.* Neither party argues that remand for factual findings is necessary.

ted). We must determine "(1) whether the unraised issues are significant and obvious from the face of the record; and (2) whether the unraised issues are clearly stronger than the raised issues." *Gray v. State*, 841 N.E.2d 1210, 1214 (Ind.Ct.App.2006) (quotation marks omitted), *trans. denied.*

### A. Admission of Chat

■■ Flanders attacks the admission of the printout of the instant message chat between H.P. and K.B., asserting that it was unauthenticated and had errors on its face. The errors to which Flanders alludes are three discrepancies in the formatting of the timestamps that precede each line of text. I.S. identified the exhibit as the text that he had printed out, but neither H.P. nor K.B. testified concerning whether it accurately reflected their conversation.

Flanders's argument is somewhat confusing because trial counsel was the proponent of this evidence. As noted by the State, it is difficult "to see how trial counsel could be ineffective for failing to challenge the admission of his own evidence." Appellee's Br. at 12. We understand Flanders to be arguing that there was no strategic reason to offer it into evidence because it was prejudicial, may have been altered, and could have successfully been objected to had the State offered it against him.

The text of the exhibit reads as follows:[4]

H.P.: hey you freakin hoe

K.B.: what u freakin bitch

H.P.: whats up?

K.B.: not a lot

K.B.: so r u going to that movie

H.P.: no i dont think so

H.P.: jeanine is still asleep

H.P.: i have to tell you sumthing about um . . . .

H.P.: last night

H.P.: hehehe

H.P.: its bad

K.B.: ok tell mle

K.B.: me

K.B.: ok then tell me

H.P.: around*

K.B.: ok

H.P.: are you now going to ur dads?

H.P.: not*

K.B.: I dont no

H.P.: ohh well then I will just call you later and tell you

K.B.: just tell me now no body will seeu

H.P.: yes huh im not takin the chance

K.B.: did u do it with him

H.P.: no

H.P.: we almost did though

H.P.: i think

H.P.: i dont know it was just weird

K.B.: ok

H.P.: i didnt know what to do

H.P.: i was kinda scurred

H.P.: lol

K.B.: did u guys kiss

H.P.: no

K.B.: then what

H.P.: well kinda

H.P.: i will call you later Mysi has to call Matt

K.B.: ok love u bye

H.P.: i will call ur cell when she gets off the phone

4. Each line of text is preceded by a screen name and a time stamp. Most of the time stamps have a format of (hh:mm:ss AM), but as noted above, three of the time stamps break with this pattern. We have replaced the girls' screen names with their initials and have omitted the time stamps; otherwise, the text of the exhibit has been reproduced exactly, including errors.

K.B.: ok

H.P.: love you too bye

K.B.: i cant tell I have ppl standing arounf i will tell you later

Defendant's Ex. 1.

In the chat, H.P. denied that they kissed or "did it." In fact, she does not specifically admit that any type of touching took place; instead, she says, "we almost did." *Id.* At times, she seems to make light of the situation, making comments like "hehehe" and "lol." *Id.* H.P. began the conversation by calling her friend a "freakin hoe," and as the prosecutor noted at trial, one interpretation of the chat is that H.P. is not the naive young girl that I.S. thought she was. *Id.*

In an attempt to show that admission of the chat was prejudicial, Flanders cites two sentences from the trial court's explanation of why it was finding him guilty: "She's [H.P.'s] just chatting with her girlfriend, as girlfriends do. I assume but for somebody interrupting this process and seeing the instant message that she would have never reported you to anybody." Petitioner's Ex. A at 135.[5] Immediately before this, the trial court stated that it thought that Flanders's proffered motivation for H.P. to lie was "weak" and did not "make any sense" because H.P. "never made any effort to cause any problem" for Flanders. *Id.* at 134–35. Thus, in context, the trial court was merely referring to the fact that it seemed unlikely that H.P. was lashing out at Flanders because she did not come forward with her allegations until her uncle found out about what happened and confronted her. Trial counsel used the chat to attempt to discredit I.S. and H.P., and we conclude that Flanders has not shown that offering the chat

for admission was an unreasonable trial strategy.

Flanders also argues that "appellate counsel failed to raise this reversible error on direct appeal." Appellant's Br. at 12. Again, his argument is difficult to understand because the chat was offered into evidence by the defense. Had appellate counsel argued that this evidence was inadmissible, we surely would have held that any error was invited. *See Stewart v. State*, 945 N.E.2d 1277, 1285 (Ind.Ct.App. 2011) ("Under the invited error doctrine, a party may not take advantage of an error that he commits, invites, or which is the natural consequence of his own neglect or misconduct."). To the extent that Flanders is arguing that appellate counsel should have raised the issue of ineffective assistance of trial counsel, we note that it is possible to raise that issue on direct appeal, but it may not be advantageous to do so because the trial record may not include the information necessary to resolve the issue. *Woods v. State*, 701 N.E.2d 1208, 1216 (Ind.1998), *cert. denied.* Flanders's briefs do not discuss the relative advantages and disadvantages of raising the issue of ineffective assistance of counsel on direct appeal. Therefore, we conclude that he has not shown that appellate counsel's decision not to raise this issue constitutes deficient performance.

### B. Character Evidence

■ Flanders argues that trial counsel was ineffective because he did not successfully object to H.P.'s testimony about Flanders holding her hand and H.P.'s and K.B.'s testimony about the time that H.P. wrote something on his tablet computer about him being "cute" or "hot." Petitioner's Ex. A at 66. The record reflects that trial counsel did object to this testimony,

---

**5.** Flanders also claims that we relied on the chat to affirm his conviction on direct appeal. Although we quoted from the chat in our statement of the facts, the analysis does not make any reference to the chat.

citing Evidence Rules 403 and 404(b), but the objections were overruled. Flanders argues, however, that trial counsel's objection would have been sustained if he had made an argument based on the *Wickizer* line of cases.

In *Wickizer v. State*, our supreme court rejected earlier case law that permitted the admission of evidence of depraved sexual instinct in prosecutions for incest, sodomy, criminal deviate conduct, or child molesting, because the admissibility of that evidence is now governed by Evidence Rule 404(b). 626 N.E.2d 795, 796 (Ind. 1993). Evidence Rule 404(b) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pre-trial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

In *Wickizer*, our supreme court held that the intent exception to the rule should be narrowly construed:

> To allow the introduction of prior conduct evidence upon this basis would be to permit the intent exception to routinely overcome the rule's otherwise emphatic prohibition against the admissibility of other crimes, wrongs, or acts to prove the character of a person in order to show action in conformity therewith. In this context, admission of prior bad acts would frequently produce the "forbidden inference" cautioned against in [*Hardin v. State*, 611 N.E.2d 123, 129 (Ind.1993) ].

> The intent exception in Evid. R. 404(b) will be available when a defendant goes beyond merely denying the charged culpability and affirmatively presents a claim of particular contrary intent. When a defendant alleges in trial a particular contrary intent, whether in opening statement, by cross-examination of the State's witnesses, or by presentation of his own case-in-chief, the State may respond by offering evidence of prior crimes, wrongs, or acts to the extent genuinely relevant to prove the defendant's intent at the time of the charged offense.

626 N.E.2d at 799.

Flanders notes that prosecutor listed "intent" as one of his proffered justifications for admitting the evidence. Petitioner's Ex. A at 20. Flanders argues that he did not claim to have a contrary intent, but clearly and emphatically claimed that the touching did not occur at all. Although the intent exception does not seem to apply, we do not agree that that the evidence is inadmissible. Flanders has not explained why H.P.'s and K.B.'s testimony about the incident where H.P. wrote that Flanders was "cute" or "hot" should be considered a prior bad act. *Id.* at 72. As for holding H.P.'s hand, the action is not sexual per se, although it arguably reflects poorly on his character.

The State directs us to *Piercefield v. State*, 877 N.E.2d 1213 (Ind.Ct.App.2007), *trans. denied.* At his trial for molesting his stepchildren, evidence was presented that Piercefield would ask the children to give him massages and would give them rewards for doing so. On appeal, Piercefield argued that the evidence should have been excluded pursuant to Evidence Rule 404(b). We distinguished Piercefield's case from cases that excluded evidence of touching that was obviously sexual or ille-

gal, and we concluded that the evidence was admissible:

> The massages were either requested or demanded by Piercefield, and in the case of D.S. were employed as a tool for the child to garner a reward or be allowed to do something. In either instance, Piercefield was familiarizing the children with touching his body. These contacts were relevant evidence of preparation or plan. We find this evidence showed Piercefield's grooming of the children to familiarize them with touching and create more physical relationship with them. The evidence was probative and admissible to show Piercefield's preparation and plan and any prejudice did not outweigh this probative value.

*Id.* at 1216.

Flanders's case is similar to *Piercefield.* Holding hands is not clearly sexual or illegal, but the evidence tends to show that Flanders was familiarizing H.P. with being touched by him and was creating a more physical relationship with her. In fact, that appears to be how the trial court viewed the evidence; before admitting it, the court confirmed that the evidence was expected to show the relationship between Flanders and H.P. In a bench trial, we presume that the court is able to concentrate on the probative portions of the testimony. *See Purvis v. State,* 829 N.E.2d 572, 587 (Ind.Ct.App.2005) (holding that evidence was admissible pursuant to the identity exception of Evidence Rule 404(b) and presuming that the court, as trier of fact, could limit this evidence to its permissible purpose), *trans. denied, cert. denied.* Thus, we conclude that Flanders has not shown that a more thorough objection would have been sustained. For the same reason, Flanders cannot show that the issue was clearly stronger than the one raised on direct appeal, and he therefore has not shown that appellate counsel was ineffective by failing to raise the issue.

## C. Impeachment of Witness

■ Flanders argues that trial counsel was ineffective because he did not make use of evidence that he could have used to impeach H.P. In his brief, Flanders identifies thirteen alleged discrepancies in H.P.'s statements. At the outset, we note, as did the post-conviction court, that Flanders primarily compares H.P.'s trial testimony with the content of the police report. The police report was written by a detective and was not a verbatim recitation of her statements; thus, discrepancies between H.P.'s testimony and the police report are not necessarily attributable to H.P.

The first alleged discrepancy is that the police report states that Flanders was wearing athletic pants at the time that he started rubbing his leg, but at trial, H.P. stated that he had changed into pajamas before he started rubbing his leg. On cross-examination, defense counsel questioned H.P. about what Flanders was wearing. She stated that Flanders had been wearing sport pants, but changed into pajamas, and she thought she had said that to the detective. This was consistent with her deposition testimony, and we fail to see what further use trial counsel could have made of this information.

The second and third alleged discrepancies both concern Flanders's trips to the lamp. The police report states that Flanders first leaned over H.P. to turn the light off, and he later said that he could not see her and came back over to turn the light on. At trial, H.P. said that he first turned the light on, then said the light was too bright and came back over to turn the light off. This was consistent with her deposition testimony. Thus, H.P. was consistent each time she testified under oath, and the only conflict is with a police report that she did not prepare.

The police report states that Flanders's penis brushed H.P.'s forehead on Flanders's second trip to the lamp. In her deposition, H.P. said that that happened on his first trip to the lamp. At trial, H.P. admitted during direct examination that she could not remember whether that happened on the first or second trip; thus, it was established on record that H.P. had difficulty remembering the timing of this event.

The police report states that Flanders "could have sidestepped [H.P.] on either side or walked around the side of the couch" to reach the lamp. Appellant's App. at 594. In her deposition, H.P. testified that there was no other way for Flanders to reach the light. Trial counsel questioned H.P. about this on cross-examination, and H.P. testified consistently with her deposition. Again, there was nothing further that counsel could do with this information.

The police report states that after Flanders made the two trips to the light, he sat down and asked H.P. to unbutton her shirt. She unbuttoned it part way, and he then asked her to unbutton it all the way. In her deposition, H.P. said that Flanders stood next to her and asked her to take off her shirt, and she unbuttoned it. She said essentially the same thing at trial. Thus, there was no discrepancy in her statements under oath.

Next, Flanders notes that there is a discrepancy between the police report and the deposition as to the position of H.P.'s arms while he was rubbing her body. It appears that neither the State nor defense counsel asked H.P. about the position of her arms at trial, probably because it is such a minor detail. Given the minimal significance of this detail, it is highly unlikely that the outcome of the trial would have been affected by it.

The police report states that Flanders "rubbed directly across her chest, just above her nipples." Id. at 594. In her deposition and at trial, H.P. did not specifically mention him touching her near her nipples, but did specify that he touched her exposed skin, including her "cleavage." Petitioner's Ex. A at 30. Even assuming that H.P. referred to two slightly different areas of her chest, the fact that he touched one of those areas does not exclude the possibility that he touched the other. Flanders has not shown that these statements actually conflict.

The police report states that Flanders "tried to push her hand down her pants." Appellant's App. at 594. At trial, defense counsel asked H.P. whether she remembered telling the police that Flanders forced her hand down her pants. She said, "No," and then explained that Flanders "pushed it but it wasn't like he had grabbed it but he wasn't forceful about it." Petitioner's Ex. A at 40. Flanders had her read from her deposition where she was asked, "He didn't try and force your hand anywhere?" and she said, "I don't think so." Id. at 41. On redirect, the prosecutor asked H.P. if Flanders attempted to guide her hand, and she replied affirmatively. Thus, defense counsel established that H.P. was somewhat equivocal as to whether Flanders moved her hand and if so, whether it was done in a forceful manner. We fail to see what further use defense counsel could have made of her slightly varying statements on this point.

The police report states that Flanders told H.P., "[M]ake yourself finish." Appellant's App. at 594. In her deposition, H.P. initially could not remember how Flanders had phrased his request. Later, she was asked, "Did Mr. Flanders ask you to make yourself finish?" and she said, "Yes. That's how he put it." Petitioner's Ex. A at 480. At trial, H.P. stated that Flanders "asked

me to make myself finish." *Id.* at 29. The fact that H.P. needed her memory refreshed as to Flanders's exact words during her deposition has little impeachment value given that the police report, the deposition, and the trial testimony were all consistent on this point.

The police report states that H.P. knew that Flanders wanted her to masturbate because "he was forcibly trying to push his [sic] hand down her pants." Appellant's App. at 594. In her deposition, she said that he knew what he meant because "he had said something to me about it before." Petitioner's Ex. A at 470. It appears that neither the prosecutor nor defense counsel asked her at trial how she knew what Flanders meant. Even if the police report accurately states the reason she gave, that does not make her deposition testimony inconsistent, as there may have been multiple reasons why she understood what he meant.

The final two alleged discrepancies concern what happened after the inappropriate touching. The police report states that after H.P. refused to masturbate, Flanders got angry, did not talk to her for the rest of the movie, and fell asleep in his chair. He awoke at 5:00 a.m., sat down beside her, and asked if everything was all right. She responded affirmatively, and Flanders went to bed. In her deposition, she stated that after the movie, Flanders came over to her and said good night and then went to bed. At trial, she said that they watched the rest of the movie, and then Flanders went to bed. Once again, her statements under oath were consistent, and the only conflict was with the report prepared by the detective.

In summary, most of the alleged discrepancies were either explained by H.P., fully examined by defense counsel, did not actually conflict, or had miniscule impeachment value. The only clear conflicts that Flanders has identified are between H.P.'s trial testimony and the police report, which was prepared by a detective, was not a verbatim recitation of H.P.'s statements, and was not given under oath. In each of these instances, H.P.'s trial testimony was consistent with her deposition testimony. Therefore, Flanders has not shown that trial counsel's cross-examination of H.P. was deficient.

In passing, Flanders argues that appellate counsel should have raised "the issue of the impeachability of State's witnesses." Appellant's Br. at 44. Appellate counsel would have had to frame this issue as an ineffective assistance of counsel issue. As discussed above, trial counsel's cross-examination of H.P. was not deficient, so appellate counsel would not have prevailed had the issue been raised.

### D. Admission of Documents in Repeat Offender Phase

During the repeat offender phase of the trial, the State offered five exhibits into evidence without objection. Exhibit 1 was an information for two counts of child molesting and a witness list; the information includes Flanders's physical description, date of birth, and social security number. Exhibit 2 was a probable cause affidavit that also includes his physical description, date of birth, and social security number. Exhibit 3 was a chronological case summary with the same case number as the information. Exhibit 4 was an order, also bearing the same case number, indicating that Flanders had pled guilty to one count of class C felony child molesting and sentencing him to six years. Exhibit 5 contained records from the Hamilton County Sheriff's Department, including photos of Flanders, his fingerprints, his physical description, date of birth, and social security number. Exhibit 5 included a certification of business records signed by the keeper of the records. The witness

list had a certification at the bottom signed by the clerk of the Hamilton County courts, but it is not clear whether it relates to any of the other documents that were admitted, and Flanders contends that the witness list was not even offered as part of Exhibit 1. There was no witness testimony concerning the authenticity of the documents.

Flanders contends that trial counsel was ineffective because he did not challenge the authenticity of the exhibits. At the post-conviction hearing, trial counsel testified, "I don't have an independent recollection of whether I objected or not. I would say this, Mr. Flanders, that I don't recall specifically how these documents were presented. All I can say is I must not have had a concern as to their authenticity." Tr. at 20. Flanders has not argued that he does not in fact have a prior conviction of class C felony child molesting, nor has he presented any evidence that the State would not have been able to produce authenticated documents had an objection been lodged. We conclude that Flanders has not shown that he was prejudiced by trial counsel's failure to object. For the same reasons, he has not shown that appellate counsel would have had a viable argument that the admission of these exhibits was fundamental error.

## II. Sexually Violent Predator

Flanders also challenges his current designation as an SVP, which subjects him to more burdensome registration and reporting requirements. We begin by discussing Flanders's criminal history and how the applicable sex offender registry statutes have changed over time.

Sometime between January 1, 1996, and August 1, 1996, Flanders committed class C felony child molesting. In 1996, he would have had a ten-year reporting requirement.

In 1998, the term SVP first appeared in the Indiana Code. Indiana Code Section 35–38–1–7.5, which appears among the criminal sentencing statutes, was enacted to govern the process by which an offender becomes an SVP. When it was first enacted in 1998, Indiana Code Section 35–38–1–7.5 required a hearing at which two psychiatrists or psychologists were to testify concerning the offender's likelihood to be a repeat offender. Pursuant to Indiana Code Section 5–2–12–13(b) (1998), an SVP had an indefinite registration period. Indiana Code Section 35–38–1–7.5 allowed an SVP to petition the court after ten years to consider whether the person should no longer be considered an SVP. The SVP could file such a petition once a year after the initial ten years. In 2003, Indiana Code Section 5–2–12–13(b) was amended to state that an SVP must register for life, but SVPs could still petition the court to terminate their SVP status pursuant to Indiana Code Section 35–38–1–7.5.

On May 10, 2005, Flanders committed class C felony sexual misconduct with a minor. Thereafter, in 2006, there were major changes to the registry statutes. They were moved from Indiana Code Chapter 5–2–12, which was within the part of the code governing law enforcement, to Indiana Code Chapter 11–8–8, which is within the part of the code governing the DOC. Indiana Code Section 35–38–1–7.5 was also amended so that there were two ways that a person could become an SVP. First, persons who committed certain enumerated offenses were by definition SVPs. Those who did not qualify based on the offenses committed were still subject to a hearing with the testimony of two experts. The statute appeared to assume that the determination would happen at sentencing, and there was some confusion as to how it applied to offenders who had already been sentenced.

In 2007, Indiana Code Section 35–38–1–7.5 was amended to clarify that certain convictions qualify an offender as an SVP "by operation of law." It was also amended to disallow a person with two unrelated convictions for sex offenses to petition for removal of the SVP designation. The 2007 version of Indiana Code Section 35–38–1–7.5 is the version currently in effect.

On May 29, 2007, Flanders was sentenced to ten years for his sexual misconduct with a minor conviction, but at the sentencing hearing, no evidence was presented and no argument was made concerning whether Flanders qualified as an SVP. The DOC apparently informed him that he was an SVP sometime after the 2006 or 2007 amendments. Flanders qualifies as an SVP under these amendments because he has two unrelated convictions for sex offenses; neither of his offenses, individually, would qualify him as an SVP as a matter of law.

Flanders makes four arguments concerning his status as an SVP: (1) the DOC does not have authority to make SVP determinations because this must be done by the trial court at sentencing; (2) the DOC violated the separation of powers provisions of the Indiana Constitution by classifying him as an SVP; (3) he was deprived of due process because he was relabeled an SVP without prior notice and a hearing; and (4) the amendments to the registration statutes are unconstitutional ex post facto laws as applied to him.

### A. Authority of the DOC

■ Flanders's first two arguments, that the SVP determination must be made by a trial court at sentencing and that the DOC violated Article 3 of the Indiana Constitution (separation of powers) by labeling him an SVP, were recently rejected by our supreme court in *Lemmon v. Harris,* 949 N.E.2d 803 (Ind.2011). Harris committed class B felony child molesting sometime between February 1997 and March 1998, before the SVP classification existed. He was sentenced to ten years and was required to register for ten years after his release from incarceration. He was placed on parole and reincarcerated several times before he was finally released on December 1, 2008. At some point after the 2007 amendments to Indiana Code Section 35–38–1–7.5, the DOC informed Harris that he was an SVP and had to register for life. Harris filed a complaint arguing that the DOC lacked authority to make an SVP determination and that he should be required to register for only ten years. The trial court granted declaratory and injunctive relief for Harris, and the DOC appealed. We affirmed, but the supreme court granted transfer and reversed.

The court noted that previous versions of the statute required the trial court to make an SVP determination at sentencing, but since 2007, the classification occurs "by operation of law" if the person had committed an enumerated offense. *Id.* at 809. "The statute does not grant the DOC any authority to classify or reclassify. SVP status under Indiana Code Section 35–38–1–7.5(b) is determined by the statute itself." *Id.* at 815. Because the DOC does not make status determinations that alter a judicial determination, the court also found that there was no separation of powers issue. *Id.* at 814–15. *Harris* is squarely on point on these issues, so Flanders's first two arguments fail.

### B. Due Process

■ Flanders argues that his classification as an SVP without prior notice and a hearing violates his right to due process under the Fourteenth Amendment of the United States Constitution and Article 1, Section 12 of the Indiana Constitution. Our supreme court rejected this argument in *Doe v. O'Connor,* 790 N.E.2d 985 (Ind. 2003). In 2003, the sex offender registry

was amended to require publication of registrants' photographs and addresses. Doe was a convicted sex offender who was already required to register prior to 2003. Doe argued that he was entitled to a hearing to address whether he was dangerous or likely to reoffend before his address and photograph could be published through the registry.

Our supreme court held that there was no violation of the Fourteenth Amendment, citing *Connecticut Department of Public Safety v. Doe*, 538 U.S. 1, 123 S.Ct. 1160, 155 L.Ed.2d 98 (2003), which upheld the constitutionality of a similar registry statute against a similar claim.[6] Our supreme court found the reasoning of *Connecticut Department of Public Safety* persuasive and also rejected Doe's Article 1, Section 12 claim. *O'Connor*, 790 N.E.2d at 989. The publication of Doe's photograph and address were not based on his dangerousness or likelihood to offend, but on his conviction and already existing requirement to register. *Id.* Thus, Doe was not entitled to a hearing on the issue of whether he was dangerous or likely to reoffend:

> But we see the issue much the same way the Supreme Court did in *Connecticut Dep't of Pub. Safety,* that is, even if Doe is at risk of deprivation of a constitutionally protected interest, due course of law does not entitle him to a hearing to establish a fact—current or future dangerousness—that is not material under the 2003 Directory and the Sheriffs' Registry statutes. To paraphrase the Supreme Court, even if Doe could prove that he is not likely to be currently

dangerous, the Legislature has decided that the registry information of all sex offenders—currently dangerous or not— must be publicly disclosed.

*Id.* *O'Connor* and *Connecticut Department of Public Safety* control; therefore, Flanders's argument fails.

### C. Ex Post Facto

 Flanders argues that his classification as an SVP violates Article 1, Section 24 of the Indiana Constitution, which prohibits ex post facto laws. This provision prohibits the enactment of a law that imposes a punishment for an act that was not punishable at the time that it was committed or imposes additional punishment to that which was then prescribed. *Jensen v. State*, 905 N.E.2d 384, 389 (Ind. 2009). "The underlying purpose of the Ex Post Facto Clause is to give effect to the fundamental principle that persons have a right to fair warning of that conduct which will give rise to criminal penalties." *Id.* Two cases set the analytical framework for this issue: *Jensen* and *Harris*.[7]

Jensen was charged in 1999 and pled guilty to class C felony child molesting and class C felony vicarious sexual gratification. After the 2006 amendments, Jensen was informed that he was an SVP and would have to register for life. Jensen filed a motion with the trial court to determine his registration, and the trial court found that he was an SVP and had to register for life.

On appeal, Jensen argued that the 2006 amendments were an ex post facto law as

---

6. In fact, Doe withdrew his Fourteenth Amendment challenge after *Connecticut Department of Public Safety* was decided. *O'Connor*, 790 N.E.2d at 988.

7. Justice Rucker wrote a plurality opinion in *Jensen* that was joined by Chief Justice Shepard. Justice Sullivan believed that the issue was not ripe, but concurred in result. Jus-

tices Boehm and Dickson dissented. *Harris* was written by Justice Sullivan and followed the reasoning of *Jensen*. Justice Dickson was the only dissenter in *Harris*. As the analysis in *Jensen* is now backed by a majority of the court, we will not make further reference to the fact that it was a plurality opinion.

applied to him. We ruled that Jensen could only be required to register for ten years, but our supreme court affirmed the judgment of the trial court. The court noted that the U.S. Supreme Court had upheld Alaska's sex offender registry act, which was similar to Indiana's. Therefore, the court proceeded to discuss application of the Indiana Constitution. The court adopted the "intent-effects" test. *Jensen*, 905 N.E.2d at 390.

> Under this test the court must first determine whether the legislature meant the statute to establish civil proceedings. If the intention of the legislature was to impose punishment, then that ends the inquiry, because punishment results. If, however the court concludes the legislature intended a non-punitive regulatory scheme, then the court must further examine whether the statutory scheme is so punitive in effect as to negate that intention thereby transforming what was intended as a civil regulatory scheme into a criminal penalty.

*Id.* (citations omitted). The court concluded that there was no evidence of a punitive intent on the part of the legislature; therefore, the court considered whether the registration act nevertheless has a punitive effect. *Id.* at 391.

The court adopted a seven-factor test: (1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as punishment; (3) whether it comes into play only on a finding of scienter; (4) whether it promotes the traditional aims of punishment—retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether it has a rational alternative purpose; and (7) whether it is excessive in relation to the alternative purpose. *Id.*

The court found that there were significant obligations imposed by the registration act. *Id.* Many of these were already in effect at the time that Jensen committed his offense, but SVPs do have some additional burdens, including informing law enforcement if they will be away from their residence for more than seventy-two hours and registering for life. *Id.* at 391–92. Therefore, the first factor leaned in favor of finding the act punitive. *Id.* at 392. The court compared the act to the historical punishment of shaming, and therefore found that the second factor also leaned in favor of finding the act punitive. *Id.* The court found that the act primarily applies to offenses that require a finding of scienter, so the court found that the third factor also leaned in favor of finding the act punitive. *Id.* at 392–93. The court found that the act promoted the traditional aims of punishment, but this was also true of the versions in effect prior to 2006; therefore, the court concluded that the fourth factor leaned in favor of finding the act non-punitive. *Id.* at 393. Likewise, the act applies only to behavior that is already a crime, but that was true before 2006. *Id.* Therefore, the court concluded that the fifth factor leaned in favor of finding the act non-punitive. *Id.* The court found that the act clearly promoted a rational alternative purpose: public safety. *Id.* Therefore, the court concluded that the sixth factor also leaned in favor of finding the act non-punitive. *Id.* As to the seventh factor, the court stated:

> The "broad and sweeping" disclosure requirements were in place and applied to Jensen at the time of his guilty plea in January 2000. Nothing in that regard was changed by the 2006 amendments. And with regard to lifetime registration, we note that sexually violent predators may, after ten years, "petition the court to consider whether the person should no longer be considered a sexually vio-

lent predator." Ind.Code § 35–38–1–7.5(g) (2006).

*Id.* at 394. Thus, the court also concluded that the seventh factor leaned in favor of finding the act non-punitive and noted that this factor is afforded "considerable weight" when applying the seven-factor test. *Id.* Because four of the seven factors (including the weighty seventh factor) leaned in favor of finding the act non-punitive, the court concluded that it was not an ex post facto law. *Id.*

In the recently-decided *Harris* case, our supreme court considered an ex post facto challenge to the 2007 amendments. Our supreme court again applied the seven-factor test. The analysis of the first six factors was substantially similar to the analysis in *Jensen.* As to the seventh factor, the court stated:

> Finally and most importantly, as applied to Harris, the Act's requirements are not excessive in relation to its legitimate, regulatory purpose. Like Jensen, many of the Act's registration and disclosure requirements were in place and applied to Harris at the time he committed his offense and at the time he pled guilty to child molesting, well before the 2007 Amendment. Further, like the 2006 Amendment, the 2007 Amendment provides that in ten years from the date of his release from prison—the time frame in which Harris was originally required to register—he may petition the court "to consider whether [he] should no longer be considered [an SVP]." Ind.Code § 35–38–1–7.5(g) (Supp.2007). And, under the 2007 Amendment, the court at that point may determine if Harris presents a future threat—i.e., "suffers from a mental abnormality or personality disorder that makes [him] likely to repeatedly commit a sex offense," I.C. § 35–38–1–7.5(a)—after consulting with two psychologists or psychiatrists who have expertise in criminal behavioral disorders. I.C. § 35–38–1–7.5(g). As we read the 2007 Amendment, if he is not an SVP under this standard, then he no longer has to register as one and his lifetime-registration requirement terminates. But if he is, then the Act requires him to continue to register; he can petition the court again to determine his SVP status in another year. *Id.*
>
> It is clear to us that this provision of the 2007 Amendment advances the Act's legitimate regulatory purpose of public safety—by its terms, only those people who present a future threat are required to register for their lifetimes. Because of this provision allowing for an individualized determination based on his likelihood to reoffend after his original ten-year registration requirement is up, the 2007 Amendment seems even less punitive as applied to Harris than as to Jensen under the 2006 Amendment. *Cf. Jensen,* 905 N.E.2d at 398 (Boehm, J., dissenting) ("Without some individualized determination of continued risk, the requirements of the 2006 amendments are excessive in relation to their stated purpose.").

*Harris,* 949 N.E.2d at 812–13 (footnotes omitted).

The citation to Justice Boehm's dissent in *Jensen* is somewhat confusing. As discussed above, SVPs have been able to petition the court to change their status since 1998; *Jensen* noted this and relied on it. Although *Harris* appears to have mischaracterized the analysis of the seventh factor in *Jensen,* that mischaracterization does not alter the holding; the fact remains that Harris can petition the trial court to change his status, and our supreme court placed heavy emphasis on this.

Flanders's case is similar to *Harris* and *Jensen* as to the first six factors: three in favor of punitive and three in favor of non-punitive. His case differs as to the seventh factor because he cannot petition the court to change his status due to the fact that he has two unrelated convictions for sex offenses.[8] Thus, four of the seven factors—including the seventh factor, which our supreme court has accorded special weight—weigh in favor of finding the 2007 amendments punitive as applied to Flanders.

The State does not respond to any of Flanders's SVP arguments. The State's sole argument is that relief should be denied because Flanders did not comply with Indiana Code Section 11–8–8–22. Indiana Code Section 11–8–8–22 was first enacted in 2007. It applies

> to an offender required to register under this chapter if, due to a change in federal or state law after June 30, 2007 an individual who engaged in the same conduct as the offender: (1) would not be required to register under this chapter; or (2) would be required to register under this chapter but under less restrictive conditions.

Ind.Code § 11–8–8–22(b). Pursuant to this statute, a sex offender can petition the court to remove the person's designation as an offender or require the person to register under less restrictive conditions. Ind.Code § 11–8–8–22(c).[9] The trial court

may summarily dismiss the petition or set a hearing. The court may grant the petition after a hearing if it makes the following findings:

> (1) The law requiring the petitioner to register as an offender has changed since the date on which the petitioner was initially required to register.
>
> (2) If the petitioner who was required to register as an offender before the change in the law engaged in the same conduct after the change in law occurred, the petitioner would:
>
>> (A) not be required to register as an offender; or
>>
>> (B) be required to register as an offender, but under less restrictive conditions.
>
> (3) If the petitioner seeks relief under this section because a change in the law makes a previously unavailable defense available to the petitioner, that the petitioner has proved the defense.

Ind.Code § 11–8–8–22(g). However, the statute gives the court discretion to deny a petition even if it makes the foregoing findings. *Id.*

In 2010, several amendments were made to the statute. The legislature clarified which court the petition should be filed in; required that notice of a hearing be given to the DOC, the attorney general, the prosecutor, and the sheriff; and specified that the petition must be submitted under

---

8. Jensen also had two convictions for sex offenses, but this was not addressed because the court was considering only the validity of the 2006 amendments. It is not clear from the opinion whether Jensen's two convictions would be considered "unrelated."

9. Indiana Code Section 35–38–1–7.5 grants relief to SVPs who can demonstrate that they are no longer likely to reoffend. By comparison, Indiana Code Section 11–8–8–2 is a mechanism for offenders to seek relief from retroactive application of the sex offender reg-

istry statutes. Indiana Code Section 11–8–8–2 specifies that ex post facto claims may be raised in a petition pursuant to this section, but does not otherwise specify what type of claims may be brought. We do not understand Indiana Code Section 11–8–8–2 to provide offenders with an alternate path to remove their SVP status by showing that they are no longer likely to reoffend; such an interpretation would render the contrary language in Indiana Code Section 35–38–1–7.5(g) superfluous.

penalties of perjury and contain certain information, including the crime that the offender was convicted of, the date of conviction, the court that entered the conviction, whether the offender pled guilty or was tried, and a list of all jurisdictions where the offender is required to register. Ind.Code § 11–8–8–22(d), (e), and (k).

■■■ To the extent that the State is arguing that a petition under this section cannot be made in conjunction with a petition for post-conviction relief, no authority is cited, nor does the State advance any reason why both could not be raised in the same proceeding. The State also argues that Flanders's petition does not comply with the current provisions of Indiana Code Section 11–8–8–22. However, any of the requirements that he has not satisfied were first enacted in 2010, after he filed his petition for post-conviction relief.

The State relies on *Clampitt v. State,* 928 N.E.2d 210 (Ind.Ct.App.2010). Clampitt filed a petition to remove his SVP status pursuant to Indiana Code Section 11–8–8–22 in 2009 and was denied. On appeal, we expressed concern that the record before us did not include adequate information for us to rule on the case: "it is not clear when or in what context Clampitt was determined to be [an] SVP." *Id.* at 211. We affirmed the denial of the petition, but directed Clampitt to file an amended petition that complied with the 2010 version of the statute. *Id.* at 213.

In light of *Harris,* we do not need additional information about "when or in what context" Flanders became an SVP; he became an SVP by operation of law when the 2007 amendments went into effect. The State does not suggest that any further

factual development is needed or that it has been prejudiced in any way.[10] Therefore, we reject the State's argument that denial of his claim is appropriate based on his failure to comply with the most recent version of the statute.

No remand is necessary because no additional factual development is needed, and although Indiana Code Section 11–8–8–22 purports to give the trial court complete discretion to grant or deny a petition, we cannot say that trial courts have discretion to mandate compliance with a law that violates our constitution. Flanders argues that the remedy for the ex post facto violation is to reverse his designation as an SVP. We disagree. The problematic provision is Indiana Code Section 35–38–1–7.5(g), which made offenders with two or more unrelated convictions for sex offenses ineligible to petition the court for a change in status. Flanders can be placed in the same position as offenders like Harris and Jensen by reinstating his right to petition the court for removal of his SVP status after ten years. *See Harris,* 949 N.E.2d at 810–13 (examining the 2007 amendments separately from the remainder of the registry statutes); *State v. Pollard,* 908 N.E.2d 1145 (Ind.2009) (examining only the portion of the registry statutes that imposes restrictions on residency). If we simply eliminated Flanders's SVP status, his multiple convictions would place him in a better position than Harris, who has only one conviction.

■■■ We conclude that the 2007 version of Indiana Code Section 35–38–1–7.5(g), which made Flanders ineligible to petition for a change of status, is an unconstitutional ex post facto law as applied to him.

10. We note that the prosecutor and the Attorney General have both had notice of Flanders' claim at some stage of the proceedings. It also appears that Flanders may have put the DOC on notice by filing a classification appeal. The record contains essentially all the information that is required by the 2010 version of the statute. Flanders' SVP claim was included in his petition for post-conviction relief, which was verified.

Therefore, he must be allowed to petition for a change in status once a year after he has registered for ten years. Flanders has not shown that the remaining provisions of the sex offender statutes violate a constitutional right. Therefore, we affirm the post-conviction court as to the claims of ineffective assistance of counsel, but reverse the court's ruling as to Flanders's SVP status.

Affirmed in part and reversed in part.

BAILEY, J., and MATHIAS, J., concur.