## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

FILED
Mar 11 2015, 7:03 am
CLERK
of the supreme court, court of appeals and tax court

ATTORNEYS FOR APPELLANT

Samuel S. Shapiro
Shapiro & Lozano
Bloomington, Indiana

F. Thomas Schornhorst
Oxford, Mississippi

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ryan D. Johanningsmeier
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Roland O. Ward,
*Appellant-Defendant/Petitioner,*

v.

State of Indiana,
*Appellee-Plaintiff/Respondent.*

March 11, 2015

Court of Appeals Case No.
53A01-1408-PC-330

Appeal from the
Monroe Circuit Court

The Honorable Marc R. Kellams,
Judge

Cause Nos. 53C02-1001-FA-59 and
53C02-1209-PC-1749

**Kirsch, Judge.**

[1] Following a jury trial, Roland O. Ward was convicted of child molesting[1] as a Class A felony, five counts of sexual misconduct with a minor,[2] each as a Class B felony, escape[3] as a Class C felony, child seduction[4] as a Class D felony, dissemination of matter harmful to minors[5] as a Class D felony, and neglect of a dependent[6] as a Class D felony. Ward initiated a direct appeal, but at his request, we dismissed the appeal without prejudice, pursuant to the *Davis/Hatton* procedure, and Ward returned to the trial court to pursue post-conviction relief, which the post-conviction court denied.[7] In this combined

---

1 *See* Ind. Code § 35-42-4-3(a)(1). We note that, effective July 1, 2014, new versions of the criminal statutes with which Ward was charged were enacted, but because he committed his crimes prior to that date, we will apply the applicable statutes in effect at that time.

2 *See* Ind. Code § 35-42-4-9(a)(1).

3 *See* Ind. Code § 35-44-3-5(a).

4 *See* Ind. Code § 35-42-4-7(h).

5 *See* Ind. Code § 35-49-3-3(1).

6 *See* Ind. Code § 35-46-1-4(a)(1).

7 As we explained in *Slusher v. State*, 823 N.E.2d 1219 (Ind. Ct. App. 2005):

> [W]here it is necessary on appeal to develop an additional evidentiary record to evaluate the reasons for trial counsel's error, the proper procedure is to request that the appeal be suspended or terminated so that a more thorough record may be compiled through the pursuit of post-conviction proceedings. This procedure for developing a record for appeal is more commonly known as the *Davis/Hatton* procedure. *See Hatton v. State,* 626 N.E.2d 442, 443 (Ind. 1993); *Davis v. State,* 267 Ind. 152, 156, 368 N.E.2d 1149, 1151 (1977). As we explained, the *Davis/Hatton* procedure involves a termination or suspension of a direct appeal already initiated, upon appellate counsel's motion for remand or stay, to allow a post-conviction relief petition to be pursued in the trial court. If the appellate court preliminarily determines that the motion has sufficient merit, the entire case is remanded for consideration of the petition for post-conviction relief. If, after a full evidentiary hearing the post-conviction relief petition is denied, the appeal can be reinitiated. Thus, in addition to the issues initially raised in the direct appeal, the issues litigated in the post-conviction relief proceeding can also be raised. This way, a full hearing and record on the issue will be included in the appeal. If the petition for post-conviction relief is denied after a hearing, and the direct appeal is reinstated, the direct appeal and the appeal of the denial of post-conviction relief are consolidated.

823 N.E.2d at 1222 (some internal citations omitted).

appeal, Ward appeals the denial of post-conviction relief and reinstates his direct appeal, raising several issues that we consolidate and restate as:

> I. Whether Ward received ineffective assistance of trial counsel;
>
> II. Whether the trial court's Final Jury Instruction No. 3 constituted fundamental error; and
>
> III. Whether the State presented sufficient evidence to convict Ward of escape.

[2] We affirm.

## Facts and Procedural History

[3] K.M.J. was born in 1993, and her parents divorced when she was three years old. Beginning at age seven, she lived with her mother ("Mother") and Ward, her stepfather, in Monroe County, Indiana. Generally, she visited her biological father ("Father") several evenings each week. Over a period of at least six years, Ward sexually molested K.M.J. at her home.

[4] Ward provided gifts to K.M.J., and he imposed many rules upon K.M.J.'s ability to socialize with friends and participate in after school activities and often precluded her from going out with friends and staying at friends' homes. Ward restricted K.M.J.'s use of her cell phone, which Father had bought for her, and sometimes Ward would review K.M.J.'s text messages and record them on videotape. He deleted contacts or texts that he did not know or like. Ward would tell K.M.J. that he was jealous when she talked or texted with boys.

[5] In 2003 to 2004, K.M.J. was in fourth grade, and one night after Mother had gone to bed, K.M.J. joined Ward in the living room, where he was watching television. K.M.J. sat on his lap and saw that he was watching pornography. Ward asked her, "Wouldn't that be so cool if you could do that?" *Tr.* at 405. She replied that, no, it would not. Ward lifted her shirt and rubbed and licked her breasts. On another occasion, Ward told his son to let the dog out, and then he turned on pornography and again lifted K.M.J.'s shirt, "sucked" her breasts, and licked her vagina. *Id.* at 406.

[6] In 2004 to 2005, K.M.J. was in the fifth grade, and Ward continued to molest her "anytime he could get [her] alone." *Id.* at 408, 411. Ward would "suck [her] boobs" and "finger" her and require her to perform oral sex. *Id.* at 407, 411, 414. His acts of molestation would occur in the living room, K.M.J.'s bedroom, the basement, which could only be accessed through an outside door, and Ward's bedroom. Ward told K.M.J. that if she told anyone, she would go into foster care, he would go to jail, and Mother would hate her. The molestation happened so often that K.M.J. assumed something would happen every time they were alone.

[7] It continued throughout middle school and into eighth and ninth grades, when she was fourteen through sixteen years old. The basement became the "frequent" location for sex. *Id.* at 422. In the basement, there was a pool table with a board on top of it. Often Ward would put a small television with a built-in DVD and VHS player on the pool table and play pornographic movies, which K.M.J. identified by title, including one entitled "Slutty Schoolgirls." *Id.*

at 450, 454, 594. Ward stored the movies in a drawer of a gun cabinet in the basement. K.M.J. described that Ward would put his finger in K.M.J.'s vagina, and sometimes he would use "a dildo thing." *Id*. at 426. One was pink, one was purple, and one was clear but looked like a cactus.

[8] Ward on occasion would take K.M.J. and her female friends and buy alcohol for them, including vodka, tequila, and wine. The teens would drink, and Ward would play strip poker with them. K.M.J.'s friend, E.E., saw Ward do inappropriate things to K.M.J., such as "smack" K.M.J. on the "butt" and "boobs," which E.E. thought was "strange." *Id*. at 513.

[9] Ward had intercourse with K.M.J. when she was fourteen. The two had been drinking, and he told her that he was "horny." *Id*. at 437. Ward put a mint green blanket with snowmen on it on top of the pool table, and Ward attempted to insert his penis into K.M.J.'s vagina. K.M.J. cried, and he stopped. Although he did not attempt intercourse again for a period of time, he continued with other acts of sexual molestation, and the intercourse eventually resumed. When K.M.J. would tell Ward that she did not want to submit to the sex acts, Ward would get angry or cry, saying things like, "why don't you love me?" in an attempt to "make [her] feel bad." *Id*. at 442. When K.M.J. was fifteen and sixteen years old, the sexual activity "would happen every day," usually when Mother was at work or asleep. *Id*. at 443. The molestation included anal sex on occasion. Ward wanted to videotape them having intercourse, telling K.M.J. that she could see "how much better [she] had

gotten." *Id*. at 458-59. K.M.J. told Ward she did not want him to videotape them.

[10] Ward also molested a friend of K.M.J.'s named K.H, who, like K.M.J., was born in 1993. The two girls became friends in seventh grade, and K.H. started spending the night in eighth grade. It was "common" for the two girls and Ward to drink alcohol that Ward provided. *Id*. at 739. K.H. saw Ward grab K.M.J.'s breasts and comment about them. One night when K.H. spent the night, and the girls were discussing the subject of tattoos, Ward suggested that they watch pornographic movies to see more tattoos. Ward videotaped K.M.J. and K.H. sitting on the pool table, drinking vodka, watching a pornographic movie. Ward appeared in the videotape, asking K.M.J. to hold a cigarette for him. *State's Ex*. 17; *Tr*. at 461-62.

[11] On another night, while then-fifteen-year-old K.H. was spending the night with K.M.J., the two were drinking and playing strip poker with Ward. K.H. took off her clothes except her underwear, and Ward commented on her breasts. Later that night, after K.M.J. was asleep, Ward told K.H. to meet him in the basement, which she did, and he was standing naked. He told her to get on the pool table, and he had intercourse with K.H.

[12] On January 16, 2010, when K.M.J. was sixteen years old, she was sitting with Mother and Father, discussing moving in with Father full-time. Her parents agreed to this arrangement, and thereafter, K.M.J. disclosed to them that Ward was "having sex" with her. *Tr*. at 466-67, 552-53. K.M.J. told her parents that

she could not take it anymore. Father called the Monroe County Sheriff's Department. Detective Shawn Karr ("Detective Karr") of the Monroe County Sheriff's Department and Child Protective Services Investigator Jordan Roberts ("Roberts") met with Mother, Father, and K.M.J. at the detective's office. Detective Karr obtained a buccal swab DNA sample from K.M.J. Thereafter, Detective Karr obtained a search warrant of the residence where the molestations occurred, which was owned by Mother.

[13] That same evening, at approximately 8:00 p.m., Detective Karr, accompanied by Sergeant Braid Swain ("Sergeant Swain"), Roberts, and an evidence technician, executed the search warrant. Ward was home alone at the time. Police instructed Ward that he was to remain seated with them as police officers searched the premises. They also told Ward that he was required to stay with them because officers were going to obtain a DNA sample from him by swabbing the inside of his cheek, as provided in the search warrant. Ward asked and received permission to call his wife, get a drink, go to the bathroom, and let the pet dog inside. As he opened the door to let the dog in the house, Ward fled. Police did not locate him, but Ward turned himself into police custody the following day.

[14] During the search, police collected from the residence, among other things: a Sony digital camera, a video recorder, a Handycam, another camcorder, a Sony VCR, three video cassette tapes, a purple vibrator, a clear vibrator, and a green snowman blanket, and pornographic DVDs including "Slutty Schoolgirls."

Two of the video cameras had the recording indicator light covered up with tape.

[15] The State charged Ward with: Count I, Class A felony child molesting for performing or submitting to deviate sexual conduct with K.M.J., a child under fourteen years of age; Count II, Class B felony sexual misconduct with a minor for performing or submitting to deviate sexual conduct by penetrating the sex organ of K.M.J. with his finger; Count III, Class B felony sexual misconduct with a minor for performing or submitting to deviate sexual conduct by penetrating the anus of K.M.J. with his sex organ; Count IV, Class B felony sexual misconduct with a minor for performing or submitting to deviate sexual conduct by penetrating the sex organ of K.M.J. with an object; Count V, Class B felony sexual misconduct with a minor for performing or submitting to sexual intercourse with K.M.J., a child at least fourteen but less than sixteen years of age; Count VI, Class B felony sexual misconduct with a minor for performing or submitting to sexual intercourse with K.H., a child at least fourteen but less than sixteen years of age; Count VII, Class C felony escape; Count VIII, Class D felony child seduction by engaging in sexual intercourse with K.M.J., who was at least sixteen but less than eighteen years of age with the intent to arouse or satisfy the sexual desires of Ward or K.M.J.; Count IX, Class D felony dissemination of matter harmful to minors by knowingly disseminating such material to K.M.J.; and Count X, Class D felony neglect of a dependent, by knowingly placing K.M.J., his dependent, in a situation that endangered her life or health. Ward filed a motion to dismiss the escape charge, arguing that he

was not being lawfully detained when he fled, and the trial court denied the motion.

[16] At the jury trial, the State presented the testimony of various witnesses, including K.M.J, her friends E.E. and K.H., Mother, K.M.J.'s stepmother, and various law enforcement officers. Ward presented the testimony of his twenty-year-old son. Ward's defense theory was he did not commit the acts that he was accused of committing and that K.M.J. had fabricated the allegations as a means of retaliating for Ward's strict rules.

[17] After the State rested, Ward sought judgment of acquittal on the escape charge, which the trial court denied. After the presentation of the evidence, the parties and the trial court reviewed the trial court's proposed final jury instructions. Ward posed no objection to any of them.

[18] On October 6, 2011, the jury found Ward guilty as charged. At the January 2012 sentencing hearing, the trial court imposed an aggregate fifty-eight-year sentence.[8] Ward timely initiated a direct appeal, but with permission, he suspended the appeal to return to the trial court to pursue post-conviction relief. Among other things, his petition asserted that he received ineffective assistance of trial counsel because counsel: (1) failed to move to dismiss the charging

---

[8] The sentence consisted of: thirty years on Count I; twelve years on each of Counts II, III, IV, and V to run concurrent to each other but consecutive to Count I; twelve years on Count VI to run consecutive to the sentences imposed on Counts I through V; two years on Count VII to run consecutive to the sentences imposed on Counts I through VI; and two years each on Counts VIII, IX, and X, to run concurrent to each other but consecutive to the sentences imposed on Counts I through VII.

information for Count I because it did not allege any *mens rea*; (2) failed to move to dismiss the charging information for Counts II, III, IV, V, and VI because they did not properly allege a "knowingly" element; (3) failed to object to the trial court's preliminary and final instructions on Counts I and VIII because they failed to advise the jury that the defendant must "knowingly" have engaged in the charged conduct and advised the jury that "it is implied" that the defendant acted knowingly in his conduct; (4) failed to object to the trial court's preliminary and final jury instructions with respect to the Class B felonies charged in Counts II, III, IV, V, and VI because the instructions advised the jury that "it is implied" that the defendant acted knowingly; (5) failed to move to sever Count VI, which alleged misconduct with K.H. and was unfairly prejudicial to a fair consideration of the other charges relating only to K.M.J.; and (6) failed to object "to the misjoinder" of Count VII, the escape charge. *Appellant's App*. at 166-67.

[19] At the post-conviction hearing, Ward called his trial attorney, Jennifer Culotta ("Culotta"), to testify, along with two expert witnesses regarding whether Culotta was deficient in her representation of Ward. In July 2014, the post-conviction court issued extensive findings of fact and conclusions of law, denying Ward's petition. Ward now appeals. Additional facts will be supplied as necessary.

## Discussion and Decision

[20] As for his post-conviction issue, Ward claims that his trial counsel was ineffective for a number of reasons, set forth below. As for his direct appeal

issues, Ward contends that the trial court committed fundamental error in how it instructed the jury and also claims that his conviction for escape was not supported by sufficient evidence.

## Post-Conviction Appeal

## I. Ineffective Assistance of Counsel

[21] Indiana law allows defendants to raise a narrow set of claims through a petition for post-conviction relief. *See* Ind. Post-Conviction Rule 1(1). The scope of the relief available is limited to issues that were not known at the time of the original trial or that were not available on direct appeal. *Pruitt v. State*, 903 N.E.2d 899, 905-06 (Ind. 2009). A post-conviction petition is not a substitute for an appeal, nor does it afford the petitioner a "super appeal." *Benefield v. State*, 945 N.E.2d 791, 797 (Ind. Ct. App. 2011).

[22] Ward contends the post-conviction court erred in denying his petition for post-conviction relief. "When appealing from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment." *Id*. "'To prevail on appeal from the denial of post-conviction relief, a petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court.'" *Id.* (quoting *Kubsch v. State,* 934 N.E.2d 1138, 1144 (Ind. 2010)).

[23] Here, the post-conviction court made findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6). The findings must be supported by facts, and the conclusions must be supported by the law. *Pruitt*,

903 N.E.2d at 905. "A post-conviction court's findings and judgment will be reversed only upon a showing of clear error – that which leaves us with a definite and firm conviction that a mistake has been made." *Ben-Yisrayl v. State,* 729 N.E.2d 102, 106 (Ind. 2000) (citation and quotation marks omitted). The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses. *Benefield*, 945 N.E.2d at 797.

[24] Ward contends that he received ineffective assistance of trial counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article 1, sections 13 and 19 of the Indiana Constitution. We have articulated our standard of review as follows:

> When evaluating a claim of ineffective assistance of counsel, we apply the two-part test articulated in *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984). First, the defendant must show that counsel's performance was deficient. This requires a showing that counsel's representation fell below an objective standard of reasonableness and that the errors were so serious that they resulted in a denial of the right to counsel guaranteed to the defendant by the Sixth and Fourteenth Amendments. Second, the defendant must show that the deficient performance resulted in prejudice. To establish prejudice, a defendant must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

[25] *Benefield*, 945 N.E.2d at 797 (quoting *Perry v. State*, 904 N.E.2d 302, 308 (Ind. Ct. App. 2009), *trans. denied*). If a claim of ineffective assistance can be disposed of by analyzing the prejudice prong alone, we will do so. *Id*.

[26] We assess counsel's performance based on facts that are known at the time and not through hindsight. *Shanabarger v. State,* 846 N.E.2d 702, 709 (Ind. Ct. App. 2006), *trans. denied.* Evidence of isolated poor strategy, inexperience, or bad tactics will not support an ineffective assistance claim; instead, we evaluate counsel's performance as a whole. *Flanders v. State,* 955 N.E.2d 732, 739 (Ind. Ct. App. 2011), *trans. denied*. "[C]ounsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption." *Ritchie v. State,* 875 N.E.2d 706, 714 (Ind. 2007). As we have observed, "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney." *Hinesley v. State,* 999 N.E.2d 975, 983 (Ind. Ct. App. 2013), *trans. denied*.

[27] Ward makes the following claims of ineffective assistance of trial counsel: (1) a failure to move to dismiss seven of the ten counts in the charging information for failure to allege knowing conduct; (2) a failure to object to multiple jury instructions; (3) a failure to move to sever Count VI, which alleged intercourse with K.H.; and (4) a failure to seek severance of Count VII, the escape charge.

### *A. Charging Information*

[28] The charging information for Counts I-VI and Count VIII did not allege a *mens rea*. That is, they charged that Ward "did perform or submit to deviate sexual conduct," "did perform or submit to sexual intercourse," and "engaged in

sexual intercourse," but failed to allege that he knowingly did so.[9] *Appellant's App*. at 15-16. Ward claims that, consequently, the allegations were defective for failing to allege an essential element of the offense, and his trial counsel was ineffective for failing to move to dismiss the charges. The bulk of his argument is that, because of that failure, the trial court was not "alert[ed] . . . to constitutional defects," which later resulted in the issuance of defective jury instructions.[10]

[29] Even assuming trial counsel's performance was deficient for failing to move to dismiss the charges, Ward has failed to establish that he was prejudiced thereby. As the post-conviction court found, Ward was given sufficient notice and details of the crimes with which he was being charged to allow him to adequately prepare a defense, and thus the charges as filed were not a violation of his due process rights. Moreover, any "failure to move to dismiss was not prejudicial because the State could have refiled." *Appellant's App*. at 152 (post-conviction Conclusion No. 4). We agree.

[30] Ward has not established that, but for counsel's errors, the results of the proceedings would have been different, and we find the post-conviction court

---

[9] We note that at the time Ward was charged, the child molesting (Count I) and child seduction (Count VIII) statutes did not include a mental culpability element. Ind. Code §§ 35-42-4-3(a), 35-42-4-7. However, in addressing the *mens rea* for child molestation, our courts held that "knowingly" was sufficient. *Medina v. State*, 828 N.E.2d 427, 430 (Ind. Ct. App. 2005) (citing *Louallen v. State,* 778 N.E.2d 794, 797-98 (Ind. 2002) (where legislature fails to specify level of mental culpability, knowingly will be presumed), *trans. denied*).

[10] The issue of whether trial counsel was ineffective for failure to object to the jury instructions is later addressed in this decision.

properly determined that counsel was not ineffective for failing to move to dismiss the charges. *See Wine v. State*, 637 N.E.2d 1369, 1378 (Ind. Ct. App. 1994) (defendant not prejudiced by counsel's failure to move to dismiss charging information because State could have simply refiled charges), *trans. denied*.

### *B. Jury Instructions*

[31] Ward claims that the "same defect" that existed in the charging information, namely a failure to properly inform the jury of the required *mens rea*, also "infected" the trial court's instructions. *Appellant's Br*. at 7. Specifically, Ward challenges Final Jury Instruction No. 3 ("Final Instruction 3"), which instructed the jury with regard to Counts I, II, III, IV, V, VI and VIII.[11] In order to address Ward's concerns with Final Instruction 3, it is necessary for us to examine the separate allegations addressing various counts.

[32] With regard to Count I (Class A felony child molesting) and Count VIII (Class D felony child seduction), Final Instruction 3 failed to inform the jury that in order to find the defendant guilty of those charges, it had to find that Ward knowingly committed the offenses. Rather, like the charging information, it alleged that the jury needed to find that Ward "did perform or submit to deviate sexual conduct" (Count I) and "did engage in sexual intercourse" (Count VIII).

[11] We note that the trial court's Preliminary Instruction No. 3 was for all intents and purposes, identical to Final Instruction No. 3.

*PCR Ex.* 3 (Court's Final Instruction No. 3). In contrast to Counts I and VIII, Instruction 3 with regard to Counts II, III, IV, V, and VI, did instruct the jury that, in order to convict Ward, it had to find that Ward must have acted "knowingly," *i.e.*, he "did knowingly perform or submit to deviate sexual conduct" and "did knowingly perform sexual intercourse." *PCR Ex.* 3 (Court's Final Instruction No. 3). Additionally, Final Instruction 3 on three occasions – a paragraph for Count I, another for Counts II through VI, and a third paragraph for Count VIII – informed the jury that:

> It is implied that the defendant acted knowingly in his conduct. A person engages in conduct "knowingly" if, when he engages in the conduct, he is aware of a high probability that he is doing so.

*Id*.

[33] Ward asserts that he was denied effective assistance of counsel when his counsel failed to object to Final Instruction 3, arguing that the instruction failed to instruct the jury of an essential element, the knowingly *mens rea* element. Ward's primary argument is that by stating "it is implied that defendant acted knowingly in his conduct," Final Instruction 3 improperly removed an element of the offense from the jury's consideration.

[34] Initially, we observe, Final Instruction 3 did not entirely omit the concept of knowingly. It expressly stated on three separate occasions that "a defendant engages in conduct 'knowingly,'" stated first for Count I, again for Counts II-VI, and a third time for Count VIII. *Id*. Additionally, it instructed that, to convict Ward, the jury must find he "knowingly" engaged in the conduct as

alleged in Counts II-VI. Thus, we are not persuaded that the jury was not instructed on the *mens rea* element, as Ward claims. Of greater concern in Final Instruction 3 is the sentence stating, "It is implied that the defendant acted knowingly in his conduct." *Id*. The post-conviction court conceded that the sentence was not a correct statement of the law and should have read, "[I]t is implied that the defendant is alleged to have acted knowingly in his conduct." *Appellant's App*. at 152. The post-conviction court found that the "it is implied" statement improperly removed the knowingly element from the jury's consideration, and the court further indicated that if trial counsel had posed an objection to Final Instruction 3, the court would have sustained it.

[35] Assuming without deciding that counsel was deficient for failing to object to Final Instruction 3, a defendant's right to effective assistance of counsel is not violated unless counsel's performance prejudices the defendant. Here, Ward's defense was that the charged conduct did not occur. He did not assert the conduct was a mistake, accident, or that he did not otherwise know what he did. In line with this defense, Culotta testified that she did not consider *mens rea* or knowledge to be at issue, or in any way contested, at trial. Given Ward's defense, the jury was not asked to decide if Ward knew what he was doing when he engaged in the conduct; the jury was asked to determine if he committed the charged acts at all. There was considerable evidence mounted against Ward. It was his word against the victims' word, and the jury did not believe Ward. The post-conviction court considered the evidence presented at trial and determined that Ward failed to establish prejudice as a result of any

error associated with his counsel's failure to object to Final Instruction 3. In this case, the post-conviction judge was also the trial judge. We have held, that where the same judge conducted both the trial and the post-conviction proceedings, "[The post-conviction court's findings and judgment should be entitled to greater than usual deference" because the court is "uniquely situated to assess whether [the defendant's] counsel's performance fell below an objective standard of reasonableness . . . and whether, but for counsel's unprofessional conduct, there was a reasonable probability that the jury would have reached a different verdict." *McCullough v. State*, 973 N.E.2d 62, 75 (Ind. Ct. App. 2012), *trans. denied*.

[36] Here, the post-conviction court determined that Ward failed to carry his burden to show that, but for counsel's failure to object to Final Instruction 3, there is a reasonable probability that he would have been found not guilty. Our review of the record does not lead us to an opposite conclusion than that reached by the post-conviction court. *See Hubbard v. State*, 696 N.E.2d 72, 75 (Ind. Ct. App. 1998) (where defendant claimed he did not shoot gun that killed victim, and he was not contesting element of intent, defense counsel's failure to object to instruction, which did not state the *mens rea* for murder in the same terms as charged by the information, was not ineffective assistance).

### *C. Count VI (Involving K.H.)*

[37] Ward claims that his counsel was ineffective for failing to sever Count VI, Class B felony sexual misconduct, alleging that Ward engaged in sexual intercourse with K.H., who at the time was at least fourteen but less than sixteen years of

age. Ward argues that the joinder of the charge related to K.H., a separate alleged victim, "created an unacceptable risk that the jurors would base their findings as to K.M.J. by drawing the forbidden inference of Ward's unlawful propensity." *Appellant's Br*. at 41.

[38] Indiana Code section 35-34-1-9(a), addressing joinder of offenses, allows joinder of offenses in the same indictment or information, with each offense stated in a separate count, when the offenses:

> (1) are of the same or similar character, even if not part of a single scheme or plan; or
>
> (2) are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan.

[39] If two or more offenses are joined solely because they are of the same or similar character, as permitted in subsection 9(a)(1), a defendant is entitled to severance as a matter of right, and the trial court has no discretion to deny a defendant's motion. Ind. Code § 35-34-1-11(a); *Jackson v. State*, 938 N.E.2d 29, 35 (Ind. Ct. App. 2010), *trans. denied*. However, if the State can establish that a common modus operandi[12] linked the crimes and that the same motive induced that criminal behavior, then the offenses are sufficiently connected that joinder is justified under subsection 9(a)(2), and a defendant is not entitled to severance as a matter of right. *See Garcia-Torres v. State*, 949 N.E.2d 1229, 1232 n.5 (Ind.

---

[12] Modus operandi refers to a pattern of criminal behavior so distinctive that separate crimes are recognizable as the handiwork of the same wrongdoer. *Jackson v. State*, 938 N.E.2d 29, 37 (Ind. Ct. App. 2010), *trans. denied*. Not only must the methodology of the crimes be strikingly similar, but the method must be unique in ways which attribute the crime to one person. *Id*. (quotation omitted).

2011) (affirming court of appeals decision that two crimes were connected, and defendant thus was not entitled to severance as a matter of right of charges that stemmed from a home intrusion and rape of one victim from those charges arising from separate home intrusion and attempted rape of another victim, where the crimes occurred within 11 months of one another, involved an attacker who spoke English in a Spanish accent and fit the same general physical description, both victims were female students from same college in their early twenties, victims lived within a half mile of each other, and DNA samples recovered from the site of both incidents matched). Where severance is not a matter of right, a defendant may request, and the trial court shall grant, a severance if the trial court "determines that severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense." Ind. Code § 35-34-1-11(a). A trial court's refusal to sever charges under these circumstances is reviewed for an abuse of discretion. *Jackson*, 938 N.E.2d at 38 (trial court did not abuse its discretion when it denied motion to sever and allowed multiple counts of forgery and theft against at least seven different victims to be tried together, where offenses occurred over course of ten months at different retail establishments but reflected a common modus operandi of scamming senior citizens by offering them retail discount and taking their wallets and removing credit cards).

[40] Here, Ward admits that joinder was permissible, but maintains that he was entitled to severance of the charge because the offenses were joined solely on the ground that they were of the same or similar character, as provided in

Indiana Code section 35-34-1-9(a)(1). Ward argues that the charge should have been severed, and it was ineffective assistance of counsel not to move for severance, because of the likelihood that the jury would view K.H.'s testimony as evidence of Ward's propensity to engage in such conduct and thereby prejudice him. The State responds that any motion to sever would not have been granted because the molestations of the two girls were "a series of acts connected together" as contemplated by subsection 9(a)(2). In support of that position, the State points to certain "grooming" behaviors that included both girls, over the course of years, such as taking them to the store to buy liquor, allowing them to drink together to the point of intoxication, touching K.M.J.'s "boobs" and "butt" while K.H. was present, and showing pornography to both girls. Thus, claims the State, "acts against one necessarily included evidence regarding acts against the other such that they were connected together so that joinder was proper." *Appellee's Br*. at 38.

[41] Assuming without deciding that, as Ward claims, the joinder was under subsection 9(a)(1) such that that the trial court would have had to grant any motion to sever, the record before us reveals that strategic decisions existed for not moving to sever the charge. At the post-conviction hearing, Culotta testified that she made a conscious decision not to file a motion to sever Count VI; it was not merely the result of oversight or error. She explained that Ward maintained his innocence and that the defense theory was that the charged conduct did not occur. In line with this position, the defense strategy was to show that K.M.J. fabricated the accusations in retaliation for, and to be relieved

from, Ward's strict parenting rules, such as limited texting and cell phone use, limited after-school activities and socializing, and disapproval of some of K.M.J.'s attire. Culotta explained that her strategy was to show that K.M.J. and K.H., two close friends, had fabricated and rehearsed the allegations, such that their testimony would seem contrived. This strategic decision was based in part on her depositions of K.M.J. and K.H. Culotta further believed that pointing out trial testimony inconsistencies would undermine their credibility. Culotta also testified that she believed it was not in Ward's best interest to have separate a trial for the charge involving K.H.

[42] At the post-conviction hearing, Ward presented the testimony of legal expert Stephen Oliver ("Oliver"), who testified that Culotta's decision not to sever Count VI was not the product of reasonable trial strategy. Legal expert Russell Johnson ("Johnson") also testified, opining that Culotta's performance was deficient and her strategy was unsupported by logical premises.

[43] We observe that the choice of defense theory is a matter of trial strategy. *Benefield*, 945 N.E.2d at 799.

> Counsel is given "significant deference in choosing a strategy which, at the time and under the circumstances, he or she deems best." "A reviewing court will not second-guess the propriety of trial counsel's tactics." "[T]rial strategy is not subject to attack through an ineffective assistance of counsel claim, unless the strategy is so deficient or unreasonable as to fall outside of the objective standard of reasonableness." "This is so even when such choices may be subject to criticism or the choice ultimately prove[s] detrimental to the defendant."

*Id.* (internal citations omitted).

[44] Here, the post-conviction court determined that "counsel is permitted to make a calculated, strategic choice regarding whether to sever a claim that has been permissibly joined," and Culotta's decision not to move to sever Count VI did not constitute deficient performance of trial counsel. *Appellant's App*. at 157. Again, Judge Kellams was not only the trial judge, but he was also the post-conviction judge. This court has recognized that, in that situation, the judge's findings and judgment are entitled to greater than usual deference. *See Hinesley*, 999 N.E.2d at 988. With this in mind, and based on the record before us, we find that Ward has failed to carry his burden to show that "the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court," and we conclude that the post-conviction court did not err when it concluded that Ward was not denied the effective assistance of trial counsel for failure to sever Count VI.

### *D. Count VII (Escape Charge)*

[45] Ward claims that trial counsel was ineffective for failing to demand severance or dismissal of Count VII, the escape charge, because allowing the evidence regarding Ward's flight prejudiced him since the jury was "likely to read too much into conduct that has no demonstrable nexus to other crimes charged." *Appellant's Br*. at 41. He claims that under the provisions of Indiana Code section 35-34-1-9, discussed above, Count VII "was misjoined" with the other nine offenses, considering that escape "is not remotely similar" in nature to the other charges involving sex offenses. *Id*. at 26. He argues that, upon a proper

motion, the escape charge would have been severed pursuant to Indiana Code section 35-34-1-11.

[46] We observe that, on the first day of trial, prior to its start, Culotta moved to dismiss the escape charge, arguing that Ward was not in custody when he fled the home. The trial court denied the motion, finding that whether Ward was in lawful detention was a question of fact for the jury. After the State rested, Culotta sought judgment of acquittal on the escape charge, among others, which the trial court denied. *Tr.* at 795.

[47] Culotta testified at the post-conviction hearing, conceding that her motion to dismiss filed on the first day of trial was untimely. With regard to the possibility of moving to sever the charge, she stated that, although she considered filing such a motion, she anticipated that the State likely would introduce evidence of Ward's conduct in connection with execution of the search warrant, and she did not believe that the trial court would grant it. *PCR Ex.* 7 at 14 (Culotta Deposition).

[48] Oliver testified at the post-conviction hearing that Culotta's defense was deficient when she did not challenge the escape charge with a motion to sever or motion in limine, asserting that severance of the escape charge would have prevented the State from arguing the inference of guilt based on his flight, which occurred, and prejudiced Ward. Ward's other expert, Johnson, likewise testified that Culotta could have filed a motion in limine or motion for misjoinder of the escape charge, opining that inclusion of the escape charge

tainted the jury. He conceded, however, that he could not know whether the jury's result would have been different if the escape charge was not included. *PCR Tr*. at 118.

[49]     While testifying, both Oliver and Johnson relied upon *Dill v. State*. 741 N.E.2d 1230 (Ind. 2001), where our Supreme Court held that it was error to instruct the jury on flight as consciousness of guilt, because such instructions would improperly highlight certain evidence, but the Court also held that it was permissible for the jury to consider flight and related conduct and further recognized that such evidence is a proper subject to address in closing argument. 741 N.E.2d at 1232. The post-conviction court noted that, unlike Dill, Ward was not claiming that it was a jury instruction that created prejudice, and it rejected Ward's argument that *Dill* was determinative of his case. The post-conviction court also indicated that, had Culotta filed a motion in limine to prevent the State from arguing consciousness of guilt during its closing, "it would not have been required to grant the motion or sustain the objection." *Appellant's App*. at 159 n.6. Ultimately, the post-conviction court declined to address whether Culotta's performance was deficient, and fell below the objective standard of reasonableness, because Ward was not prejudiced. It stated, "Even if the escape charge were severed and [the State was] precluded from arguing [consciousness] of guilt in its closing, the Court finds that the jury would not have reached a different decision." *Id*. at 159.

[50]     We agree. K.M.J. detailed the course and pattern of the molestations, which generally included pornographic movies and sometimes alcohol, both of which

Ward provided, if not required. The movies were found in a drawer of a gun cabinet, as K.M.J. described. The movies, which K.M.J. identified by title, were admitted at trial and were consistent with her description. The dildos likewise were admitted and consistent with her description of them. K.H. and E.E. testified to Ward providing the girls with alcohol, and they witnessed Ward touch K.M.J. inappropriately. K.M.J. identified the green snowman blanket often used during the course of the molestations, and K.H. identified a certain sleeping bag that Ward put on the pool table before engaging in intercourse with her; both items were retrieved by police. Ward's defense was that the events did not occur and that K.M.J. and K.H. fabricated them, in order to avoid or be alleviated from his strict parenting rules; however, regularly providing alcohol to minors and playing strip poker, as claimed by K.M.J. and K.H., and which the jury evidently believed, is not consistent with strict parenting. Considering the evidence presented at trial, Ward has failed to show by a preponderance of the evidence that Culotta's failure to seek severance of the escape charge changed the results of the proceedings. Accordingly, Ward failed to establish that he was prejudiced by any failure to seek severance of the escape charge, and the post-conviction court properly denied Ward's claim that he received ineffective assistance of counsel on this basis.

## Direct Appeal

## II. Jury Instructions

[51] Ward contends that the trial court erred when it instructed the jury with Final Instruction 3. Ward raised no objection to Final Instruction 3 at trial.

Acknowledging this failure to preserve the issue below, Ward brings a direct appeal issue claiming that the trial court committed fundamental error when instructing the jury.

> A claim that has been waived by a defendant's failure to raise a contemporaneous objection can be reviewed on appeal if the reviewing court determines that a fundamental error occurred. The fundamental error exception is "extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." The error claimed must either "make a fair trial impossible" or constitute "clearly blatant violations of basic and elementary principles of due process." This exception is available only in "egregious circumstances."

*Oster v. State*, 992 N.E.2d 871, 878 (Ind. Ct. App. 2013), *trans. denied* (internal citations omitted).

[52] As a preliminary matter, we note that this court has taken the opportunity to address and compare the fundamental error and ineffective assistance standards. *See Benefield*. 945 N.E.2d at 801-05. We observed that both standards make reference to a defendant's right to a fair trial, and thus, at first reading, "[I]t is not immediately obvious whether those standards differ substantively or merely state differently the same question." *Id*. at 802. Indeed, the two standards may frequently lead to the same result. *Id.* at 803. However, the *Benefield* court recognized that there is, in fact, a "subtle difference" and that "fundamental error and prejudice for ineffective assistance of trial counsel present two substantively different questions." *Id.* at 805. The court further clarified that "because the standard for ineffective assistance prejudice is based on a reasonable probability of a different result, and fundamental error occurs

only when the error is so prejudicial that a fair trial is rendered impossible, we think the standard required to establish fundamental error presents a higher bar." *Id*. at 804. Accordingly, "[W]here an appellant has failed to prove ineffective assistance of trial counsel, our holding would exclude a finding of fundamental error." *Id*. at 805.

[53] Applying that premise here, where we have found that Ward was not prejudiced by counsel's failure to object to the jury instructions, and he therefore did not received ineffective assistance of trial counsel, Ward's claim of fundamental error fails. *See Walker v. State*, 813 N.E.2d 339 341-42 (Ind. Ct. App. 2004) ("[O]ur conclusion that Walker received effective assistance of counsel necessarily precludes Walker's right to relief under the theory of fundamental error."), *trans. denied*. Accordingly, we reject Ward's direct appeal claim that the trial court committed fundamental error in instructing the jury.

## III. Sufficiency of Evidence of Escape

[54] Ward asserts by direct appeal that the State failed to present sufficient evidence to convict him of escape. When reviewing a claim of insufficient evidence, we neither reweigh evidence nor judge the credibility of witnesses. *Anglin v. State*, 787 N.E.2d 1012, 1015 (Ind. Ct. App. 2003), *trans. denied*. We consider only the evidence which is favorable to the judgment along with the reasonable inferences to be drawn therefrom to determine whether there was sufficient evidence of probative value to support a conviction. *Id.* It is the job of the fact-finder to determine whether the evidence in a particular case sufficiently proves

each element of an offense, and we consider conflicting evidence most favorably to the trial court's ruling. *Peaver v. State*, 937 N.E.2d 896, 902 (Ind. Ct. App. 2010), *trans. denied*.

[55] To prove escape as charged, the State was required to show that Ward intentionally fled from lawful detention. Ind. Code § 35-44-3-5(a). "Lawful detention" is defined in Indiana Code section 35-41-1-18(a), and includes the following:

> (1) arrest;
>
> (2) custody following surrender in lieu of arrest;
>
> (3) detention in a penal facility;
>
> . . . .
>
> (8) electronic monitoring;
>
> (9) custody for purposes incident to any of the above including transportation, medical diagnosis or treatment, court appearances, work, or recreation; or
>
> (10) any other detention for law enforcement purposes.

[56] Ward's contention on appeal is that "[h]aving been told he was not under arrest, Ward reasonably believed that he was not compelled to remain on the premises, even for the swab authorized by the warrant." *Appellant's Br*. at 19. After review of the relevant statute and case law, we disagree. The offense of escape requires that Ward fled from lawful detention, but lawful detention does not require arrest; it includes "any other detention for law enforcement purposes." Ind. Code § 35-41-1-18(a)(10).

[57] Here, on January 16, 2010, police executed a search warrant of the residence at approximately 8:00 p.m. When police arrived, Ward was standing in the driveway next to his car, which was running. The exterior door to the basement was open, and Ward's car was parked next to it. Detective Karr and Roberts escorted Ward into the living room. Detective Karr instructed Ward that he was to remain seated and stay with Detective Karr while other officers searched the premises. Detective Karr explained at trial that it is standard practice, for officer safety and to allow the searching officers to focus on the task of searching for items, that the suspect remain with an officer during the search. Detective Karr also advised Ward that the search warrant allowed police to collect a buccal swab from Ward for DNA evidence, and Detective Karr expressly told Ward that he had to remain with him until he collected the buccal swab. *Tr.* at 584. Ward appeared very nervous and continued to get up and begin to move about, and on fifteen occasions within the course of an hour, Detective Karr directed Ward to return to his chair and be seated. That conversation between Ward and Detective Karr was audio recorded and admitted into evidence at the post-conviction hearing. Toward the end of the search, Sergeant Swain showed Detective Karr one of the video cameras from the basement that had the recording light covered with tape, arguably incriminating evidence. A few minutes thereafter, Ward was given permission to let a pet dog inside. Sergeant Swain accompanied Ward to the kitchen back door, and when Ward opened the door, he fled on foot, running into the darkness toward a barn. Sergeant Swain yelled at Ward to stop, but he did not. Sergeant Swain and Detective Karr pursued Ward briefly, but lost him.

Detective Karr had not yet obtained the buccal swab from Ward. The next day, Ward's father contacted law enforcement, and Ward turned himself in at the Sheriff's Department.

[58] Under these circumstances, we find that, at the time Ward fled, he was being detained "for law enforcement purposes" as considered by Indiana Code section 35-14-1-18(a)(10). While Ward was not under arrest, Ward was being supervised and instructed to stay with police in a single room while the warrant was being executed. Police repeatedly told Ward to stay seated for officer safety and because, when the search was completed, officers would be obtaining a DNA sample from him as permitted by the warrant. When Ward went to the back door to let the dog in, he was accompanied by a law enforcement officer.

[59] We find that the facts and circumstances of Ward's case are distinguishable from *Mesarosh v. State*, 801 N.E.2d 200 (Ind. Ct. App. 2004). In that case, Mesarosh was stopped by police while driving his truck because police knew there was an active arrest warrant on him. We determined that when police initially stopped Mesarosh, and he exited his vehicle, and police told him that they intended to arrest him pursuant to the active warrant, Mesarosh's freedom of movement was restricted, and he was being detained for law enforcement purposes. *Id*. at 203. However, Mesarosh thereafter argued with police about taking him into custody, and he requested and received permission to drop off a passenger and then drive his vehicle home and park it there, where police could take him into custody. We determined that when Mesarosh was given that permission to leave and was driving his truck, although still followed by a

police car, Mesarosh's freedom of movement was effectively "unrestrained," and he was no longer being detained for law enforcement purposes. *Id*. Consequently, at the point in time when Mesarosh fled on foot after parking his vehicle, he was not, at that moment, being lawfully detained, and we reversed his conviction for escape, but instructed the trial court to enter conviction for the lesser-included offense of failure to return to lawful detention. *Id*. at 203-04.

[60] In contrast to the facts of *Mesarosh*, Ward was not given any temporary leave or liberty, he was supervised and accompanied at all times and was told that he needed to remain with Detective Karr until the search was completed and a buccal swab had been obtained from him. Under such circumstances, we are not persuaded that he reasonably believed that he was not compelled to stay on the premises, as he claims. We find that the State presented sufficient evidence from which the jury could conclude that Ward committed escape.

[61] Affirmed.

Friedlander, J., and Crone, J., concur.